*Robert F. Cherry, Jr., et al. v. Mayor and City Council of Baltimore City*, No. 36, September Term, 2020. Opinion by Biran, J.

**MUNICIPAL CORPORATIONS – PENSIONS AND RETIREMENT BENEFITS – BREACH OF CONTRACT –** Baltimore City maintains a Fire and Police Employees' Retirement System (the "Plan") to provide pension benefits to uniformed officers in the City's police and fire departments. The statute governing the Plan, Article 22 of the Baltimore City Code, provides that a contractual relationship exists between Plan members and the City, and that the benefits provided under the Plan "shall not thereafter be in any way diminished or impaired." Balt. City Code, art. 22, § 42 (2009). The Court of Appeals held that the City did not breach its statutory contract with Plan members by allegedly "underfunding" retiree reserves.

**MUNICIPAL CORPORATIONS – PENSIONS AND RETIREMENT BENEFITS – BREACH OF CONTRACT – VESTED BENEFITS – RESERVED POWER –** In June 2010, the City Council enacted Ordinance 10-306, which made several significant changes to the Plan's terms and benefits. The Court of Appeals held that the City breached its contract with those Plan members who were retired as of June 30, 2010 (the "Retired Sub-class"), or eligible to retire but still working on June 30, 2010 (the "Retirement-Eligible Sub-class"). Ordinance 10-306 retrospectively divested benefits belonging to those Plan members by replacing a market-driven post-retirement cost-of-living adjustment feature (the "Variable Benefit") with a tiered cost-of-living adjustment ("COLA"). However, the City did not breach its contract with Plan members who were working as of June 30, 2010, and not yet eligible to retire as of that date (the "Active Sub-class"). A governmental employer has the reserved power to make reasonable and necessary prospective changes to its pension plan. The Court of Appeals affirmed the circuit court's findings that, as to the Active Sub-class, whose benefits had not vested prior to the enactment of Ordinance 10-306, the City made reasonable and necessary prospective changes to the Plan.

**MUNICIPAL CORPORATIONS – PENSIONS AND RETIREMENT BENEFITS – BREACH OF CONTRACT – DAMAGES –** The Court of Appeals held that the circuit court correctly calculated damages owed to the Retired and Retirement-Eligible Sub-classes. The circuit court did not err in accepting the damages model provided by the City's expert witness, and rejecting the competing model advanced by the Plan members' expert witnesses. The City's expert witness provided the circuit court with an accurate assessment of how the members of the Retired and Retirement-Eligible Sub-classes would have fared if, hypothetically, the City had retained the Variable Benefit for them but made the prospective changes to the Plan for other members that the City was permitted to make.

Circuit Court for Baltimore City
Case No.: 24-C-16-004670
Argued: February 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2020

_____

ROBERT F. CHERRY, JR., ET AL.

v.

MAYOR AND CITY COUNCIL
OF BALTIMORE CITY

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Biran, J.

_____

Filed: August 16, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Over the course of time, governing bodies of large cities face many challenges. One such challenge that some cities and other local governments may confront is how to change a public pension plan that is actuarially unsound. Often, the public employees who participate in these plans are represented by unions that register legitimate objections to proposed modifications. Taking such action in the face of opposition by public employees can be difficult politically. The challenge is magnified when the city is in dire financial straits. In such a situation, the city may have to choose between the lesser of two evils: change the plan without the consent, and to the consternation, of employees who have devoted their careers to public service; or keep the plan as is and put the city deeper into debt, perhaps even risking financial ruin. In 2010, Baltimore City faced this choice.

Baltimore City maintains a Fire and Police Employees' Retirement System (the "Plan") to provide pension benefits to uniformed officers in the City's police and fire departments. The statute governing the Plan provides that a contractual relationship exists between Plan members and the City, and that the benefits provided under the Plan "shall not thereafter be in any way diminished or impaired." Balt. City Code, art. 22, § 42 (2009). In June 2010, facing a perfect storm of financial challenges, the City enacted Ordinance 10-306 by which the City changed some of the key terms of the Plan to make it actuarially sound. Most notably, it replaced a variable post-retirement cost-of-living adjustment that was based entirely on the investment performance of Plan assets with a guaranteed, tiered cost-of-living adjustment that is not market-driven.

On behalf of themselves and others similarly situated, several City police officers and firefighters filed a class action lawsuit against the Mayor and City Council of Baltimore

in the United States District Court for the District of Maryland. After the federal court directed the plaintiffs to refile their state law claims in state court, the plaintiffs commenced a class action lawsuit in the Circuit Court for Baltimore City, alleging claims for declaratory relief and breach of contract. Eventually, the circuit court (the Honorable Julie R. Rubin) certified a class of plaintiffs (the Appellants/Cross-Appellees here) and three sub-classes: Plan members who retired from service before the enactment of Ordinance 10-306 (the "Retired Sub-class"); currently employed members who had reached eligibility to retire but who had not yet retired (the "Retirement-Eligible Sub-class"); and currently employed members who had not yet reached retirement eligibility (the "Active Sub-class").

After a bench trial, the circuit court ruled that the City breached its contract with the Retired and Retirement-Eligible Sub-classes, finding that Ordinance 10-306 retrospectively divested the members of those sub-classes of benefits they had earned. The court awarded more than $30 million in damages to members of the Retired and Retirement-Eligible Sub-classes. However, the circuit court found no breach of the City's contract with the Active Sub-class, ruling that, as to the Active members, Ordinance 10-306 did not affect vested benefits, but rather made permissible prospective changes to the Plan.

Finding no factual or legal errors in the circuit court's rulings, we affirm its judgment in all respects.

# I

# Background

### A. The City's Fire and Police Employees' Retirement System (The Plan)[1]

Article II, Section 26 of the Baltimore City Charter authorizes the City to "establish and maintain a system of pensions and retirement benefits" for officers and employees of the Baltimore Police and Fire Departments. Balt., Md., Charter art. II, § 26. In 1962, the City established the current version of its pension plan for police officers and firefighters – the Plan – to be managed by a Board of Trustees (the "Board" or the "Trustees"). Balt. City Code, art. 22, §§ 29, 33(a) (2009). The Plan's terms and benefits are set forth in Article 22 of the Baltimore City Code ("Article 22").[2] Changes to the Plan may only be made by legislation passed by the City Council and signed into law by the Mayor.

Section 42 of Article 22 provides that, upon becoming a member of the Plan, the member

> shall thereupon be deemed to have entered into a contract with the Mayor and City Council of Baltimore, the terms of which shall be the provisions of this Article 22, as they exist at the effective date of this ordinance, or at the time of becoming a member, whichever is later, and the benefits provided thereunder shall not thereafter be in any way diminished or impaired.

---

[1] The facts set forth in this section of our opinion are largely drawn from the findings of fact contained in the circuit court's Memorandum Opinion of May 13, 2019, and the parties' Joint Statement of Stipulation of Fact and Other Matters, dated May 3, 2017.

[2] Unless otherwise noted, we refer to Article 22 as set forth in the 2009 version of the Baltimore City Code.

The Plan covers all uniformed officers of the Baltimore Police and Fire Departments, as well as certain other public safety workers. Under the Plan, there are three categories of retirement benefits eligibility: Service Retirement, Non-Line-of-Duty Disability Retirement, and Line-of-Duty Disability Retirement. Participation in the Plan by covered workers is mandatory during their employment. Prior to July 1, 2003, Service Retirement eligibility required members to reach 50 years of age or accrue 20 years of service. For membership beginning on or after July 1, 2003, members were eligible for Service Retirement when they reached 50 years of age with 10 years of service as a contributing member, or accrued 20 years of creditable service with 10 years of service as a contributing member. In the years just prior to the passage of Ordinance 10-306, Active members contributed 6% of their regular annual compensation to the Plan.

Section 36 of Article 22 lists four funds that are used to hold Plan assets and from which basic benefits are paid: (i) the Annuity Savings Fund ("ASF"); (ii) the Annuity Reserve Fund ("ARF"); (iii) the Pension Accumulation Fund ("PAF"); and (iv) the Pension Reserve Fund ("PRF"). *Id.* § 36(a)(1). The ASF, ARF, and PRF all are housed within the PAF.

The ASF "consists of the assets for each member's annuity portion of the member's retirement benefit." *Id.* § 36(b)(1). In other words, the ASF contains member contributions for Active members. *Id.* § 36(b)(2). Under § 36(b)(4), the Board of Trustees transfers a

4

member's accumulated contributions[3] from the ASF to the ARF upon the member's retirement. The ARF serves as the fund from which shall be paid all annuities[4] and all benefits in lieu of annuities, payable as provided in § 36. In short, the ARF contains retired members' contributions.

Section 36(d) defines the PAF, including how it is funded and maintained:

> The Pension Accumulation Fund shall be the fund in which shall be accumulated all reserves for the payment of all pensions and other benefits payable from contributions made by the City of Baltimore and from which shall be paid all pensions and other benefits on account of members with prior service credit and lump sum death benefits for all members payable from the said contributions.

*Id.* § 36(d)(1).

Under § 36(e), the PRF is "the fund from which the pension is paid to members not entitled to credit for prior service and benefits in lieu thereof." When a member not entitled to credit for prior service[5] retires, "an amount equal to that member's pension reserve shall be transferred from the Pension Accumulation Fund to the Pension Reserve Fund." *Id.* § 36(d)(7).

---

[3] Section 30(10) defines "accumulated contribution" as "the sum of all the amount deducted from the compensation of a member and credited to his individual account in the Annuity Savings Fund together with regular interest thereon as provided in §§ 35 and 36[.]"

[4] Section 30(12) defines "annuity" as "payments for life derived from the 'accumulated contributions' of a member."

[5] Section 30(7) defines "Prior Service" as "service rendered prior to January 1, 1926, for which credit is allowable[.]"

5

Section 36 requires that the City make annual contributions to the Plan. The City's annual contribution to the Plan consists of two primary components: for the preceding fiscal year, (1) "a certain percentage of the earnable compensation of each member to be known as the 'normal contribution,'" and (2) "an additional percentage of [the member's] earnable compensation to be known as the 'accrued liability contribution.'" *Id.* § 36(d)(2). Section 36(d)(5) describes the City's annual contribution requirement with further reference to the two components:

> The required contribution by the City of Baltimore is the amount equal to the normal cost, plus the accrued liability contribution or less the amortization of the excess assets, as the case may be. However, the aggregate payment by the City must be sufficient, when combined with the amount in the fund, to provide the pensions and other benefits payable out of the [PAF] during the then-current year.

*Id.* § 36(d)(5).

Section 37 provides that "[t]he creation and maintenance of reserves in the [PAF], the maintenance of annuity reserves and pension reserves as provided for, and regular interest creditable to the various funds as provided in § 35(b) of this subtitle and the payment of all pensions, annuities, retirement allowances, refunds and other benefits granted under the provisions of this subtitle and all expenses in connection with the administration and operation of this Retirement System are hereby made obligations of the City of Baltimore."

Section 33(m) requires an actuary, designated by the Board of Trustees, to serve as "the technical adviser of the Board of Trustees on matters regarding the operation of the funds" of the Plan. Responsibilities of the actuary include: conducting an actuarial

investigation at least once every five years to assess and value the Plan's assets and liabilities and "certify" Plan member and City contribution rates and relevant tables going forward, *id.* § 33(n)-(o); recommending the Board formally adopt actuarial tables and rates of contribution based on the survey, *id.* § 33(n); and performing "an annual valuation of the assets and liabilities of the funds of the system" based on the adopted tables. *Id.* § 33(p).

Each year, the Plan actuary develops an Actuarial Valuation Report ("AVR"), which provides the actuary's opinion and recommendation to the Board regarding the required annual contribution amount. *Id.* The AVR is based on, among other things, the interest rate set forth in § 30 of Article 22, and mortality and other statistical tables accepted by the Board. Prior to the enactment of Ordinance 10-306, Article 22 required that the Plan's actuary use two earnings assumptions in making its recommendations to the Board: an assumed rate of return of 8.25% on assets held for the pre-retirement period, and a rate of 6.8% on assets held for the post-retirement period.[6] Following the Board's approval of the assumptions and methods on which the AVR is based, as well as the Plan actuary's recommendation and advice regarding the required contributions, the Board certifies the amount of the City's annual Plan contribution, which is then incorporated into the City's operating budget. *Id*. §§ 33(p), 36(f). The City is required to balance its budget.

---

[6] Prior to the passage of Ordinance 10-306, those rates had been in place since Fiscal Year 1995.

## The Variable Benefit Feature

In 1983, a variable benefit feature (the "Variable Benefit") was added to the Plan as § 36A of Article 22 to provide a post-retirement cost-of-living adjustment ("COLA") for retirees and beneficiaries with more than two years of retirement. Before the Variable Benefit was instituted, the Plan had no provision for post-retirement benefit increases and members only received raises on an *ad hoc* basis after lobbying the City Council.

Payment of the Variable Benefit was contingent on the annual investment performance of Plan assets. Any and all earnings of the PRF and ARF between 7.5% and 10%, plus half the earnings in excess of 10%, were transferred from those funds to two different funds, the Paid-Up Benefit Fund and the Contingency Reserve Fund, which were established to hold Variable Benefit assets. The amount of earnings formed the basis to calculate the annual increase to the pension benefit to be paid for the expected life of each eligible member or beneficiary in accordance with the statutory rate.

Variable Benefit payments were not guaranteed by the City. Rather, once the retiree assets reached the defined performance threshold to trigger the Variable Benefit, those benefits would be paid as long as the Paid-Up Benefit and Contingency Reserve Funds permitted. *Id.* § 36A(e)(ii). Section 36A(e)(ii) further provided that, "§§ 37 and 42 to the contrary notwithstanding, any benefit increase provided under this section is not and does not become an obligation of the City of Baltimore. In the event of any conflict between this section and either or both of § 37 or § 42, this section prevails." *Id.*

8

Investment performance for purposes of calculating the Variable Benefit stood alone for each year. Therefore, performance below the 7.5% threshold was not carried forward and averaged with higher performing future years.

<u>The Impact of the Variable Benefit on the Plan and the City's Finances</u>

Beginning in February 2002, the Plan's actuary, Douglas Rowe, concerned about the negative impact of the Variable Benefit on the Plan's assets, advised the City to consider alternatives to the Variable Benefit. The problem was that the Variable Benefit was drawing funds away from the assets required to pay basic retirement benefits, leading Mr. Rowe to be concerned that "[t]here wouldn't be enough money to pay benefits over time."[7] In light of these concerns, beginning in 2003 and continuing through 2009, Mr. Rowe recommended reducing the post-retirement earnings assumption rate, which was then 6.8%, to 5%. Lowering that rate would require the City to increase its annual Plan contribution. Despite Mr. Rowe's repeated recommendations over several years, the Board did not approve a reduction in the post-retirement earnings assumption rate until 2009. The earnings assumption rate on post-retirement assets stayed at 6.8% until the Variable Benefit was removed altogether with the enactment of Ordinance 10-306.

---

[7] As discussed below, before this case came to state court, Appellants filed a class action lawsuit in the United States District Court for the District of Maryland, asserting both federal constitutional claims and state law breach of contract claims. We are told that the presiding federal district court judge, the Honorable Marvin J. Garbis, referred to the Variable Benefit during a hearing in the case as "wacko," "totally irrational," and "extremely wacko."

By 2005, the Plan had accumulated net losses amounting to $412.8 million, due in large part to the bursting of the dot.com/technology bubble in the early 2000s. Those losses were "smoothed"[8] and then amortized over a period of 10 years beginning June 30, 2005.

In Fiscal Year (FY) 2009, the City closed a $68.5 million deficit that resulted from the Great Recession in 2008 and 2009 by making significant cuts to other programs. However, as of June 20, 2009, the City still faced a $120 million projected deficit for FY2010[9] as a result of the Great Recession. As of June 30, 2009, the balance in the PAF showed a deficit of $514,413,177 based on a 6.8% post-retirement earnings assumption rate. At a 5% assumption rate, that deficit would have been $799,133,666, yet an amount greater than all of the earnings attributed to active and retiree Plan member assets nevertheless would have to have been transferred to the Paid-Up Benefit Fund for a FY2010 Variable Benefit increase.

The City addressed the FY2010 crisis with additional cuts to core services, but unforeseen reductions in State aid and revenue shortfalls resulted in an additional, mid-year deficit of $60.2 million, which necessitated more cuts, including unpaid furloughs. The record snowfall in 2010 required still more cuts to City services and personnel, as well

---

[8] "Smoothing" is not the same thing as amortization. Smoothing is a method of phasing in recognition of losses or gains for a given year for the purposes of actuarial value of Plan liabilities or assets to arrive at the City's annual contribution obligation. Amortization is the gradual reduction of debt over a given period, which, in the context of the Plan, allows the City to gradually fund its unfunded pension liability.

[9] The City operates on a July 1 fiscal year. For example, FY2010 began on July 1, 2009, and ended on June 30, 2010.

as the use of $30 million of emergency reserves. As a result of these conditions, the City faced a $121 million budget deficit for FY2011. This was the City's third consecutive year of declining revenues and multi-million-dollar budget deficits.

As of June 2010, Plan assets totaled $1,295,823,326. The liabilities owed to retired Plan members as of that date exceeded Plan assets by more than $200 million. The FY2011 recommended budget included a $101 million contribution for the Plan, but did not take into account the additional $64 million contribution that, in light of the stock market's partial rebound, the City would be required to make if it retained the Variable Benefit and followed the Board's recommendation to reduce the assumed investment-return rate. In an effort to secure the necessary funds to balance its budget, the City made still more cuts and raised $50 million in new taxes from its already depleted tax base.

In the Spring of 2009, then-City Council President Stephanie Rawlings-Blake had sought advice from the Greater Baltimore Committee (the "GBC") on how the Plan might be fixed. In response, the GBC formed a Fire and Police Pension Task Force, which produced a report and recommendations regarding modifications to the Plan to rectify what it observed was an "urgent" crisis. The GBC report confirmed that "[t]he City of Baltimore is facing a serious fiscal challenge. Current contributions to fund the [Plan] are inadequate to fully cover the existing and anticipated liabilities required under the pension system." The report further explained that the combination of "negative investment performance of 21.9%, the recognition of additional accumulated losses … used in previous years to provide benefit improvements to members and retirees, contribution reductions by the City, and costly post-retirement benefit increase provisions [(the Variable Benefit)], will drive

11

the employer contribution requirements to unsustainable new highs." The GBC also noted the stark contrast between the Plan's actuarial valuation, which indicated a funded ratio of 84%, and its market value of 58.2%. The GBC report further averred that a failure to fix the Plan might impair the City's ability to attract new fire and police employees, as well as new businesses, and might increase the cost of borrowing – a consequence that could result in higher taxes or further budgetary pressures on the City. The report also confirmed the existence of the City's serious financial problems and the inadequacy of the current contributions to fully cover the existing and anticipated liabilities required under the system, as well as the threat to the City's ability to provide basic public services and fulfill the commitment it made to retirees. The GBC recommended replacing the Variable Benefit with a COLA not to exceed three percent.

The circuit court's findings echo the GBC report's conclusions. The court found that "[t]he Plan was unsustainable in its own right. The design of the Variable Benefit was fundamentally flawed from the start – posing a potential independent annual financial obligation unafflicted by past years' market performance and the impact such performance might have on the City's ability to fund the basic benefit in any given year. That design made the Variable Benefit particularly ill-suited to operating the Plan in a volatile market." The circuit court also found that the Plan's financial problems, including the unsustainable Variable Benefit, "threatened to dismantle the City's already weakened capacity to provide basic, core services to City residents" and "its ability to keep pace with its basic benefit Plan obligation."

Following the GBC report, when it appeared inevitable that legislative changes would be made, police and firefighter union representatives acknowledged that the City could not afford to repair the funding level of the Plan by reducing the post-retirement assumed rate of return to five percent. The unions proposed eliminating the Variable Benefit entirely in favor of a plan that included a fixed 2% COLA and increasing employee contribution requirements from 6% to 9%, spread over an equal number of years. Ultimately, the unions amended their proposal in June 2010 to include extending the 20-year open, level dollar amortization period (then in place) to a 30-year open, level percent-of-pay amortization period; the unions proposed not only to extend the amortization period, but also to change the method in a way that would allow for smaller funding payments at the front end of the period, further exacerbating the City's unfunded Plan liabilities. The City found the unions' proposal unappealing because it did not repair the problem but rather delayed it for another day and another administration.

In October 2009, the Board voted to adopt the Plan actuary's recommendation to reduce the post-retirement earnings assumption rate from 6.8% to 5%. Then Mayor Rawlings-Blake believed that, absent legislative modification of the Plan by the close of FY2010, the "financial health of the City" would be "changed" because of the City's inability to meet its increased contribution obligation brought about by a drop in the post-retirement assets earnings assumption rate per the Board's recommendation. Mayor Rawlings-Blake believed that other legislative changes to the Plan were necessary to put the City on the path of pension plan sustainability.

13

Ordinance 10-306

On June 7, 2010, Council Bill 10-0519 was introduced with proposed changes to the retirement benefits provided under the Plan. At the June 2010 hearing on Bill 10-0519 before the Taxation, Finance and Economic Development Committee of the City Council, Appellant Robert F. Cherry, Jr. testified that the unions acknowledged well before that time that the Plan had systemic problems requiring change.[10] Mr. Cherry noted that "[w]e did submit a proposal back in March 2009, so although we have been recently meeting to come up with an alternative, it was the Unions who first recognized that this Plan, or the problem with the Plan is a lot more systemic and going forward we recognize that we need to increase our contributions…. [E]liminating the Variable Benefit was something our retirees will be willing to do if, in turn, you'd give them a COLA that they can live with and their widows can live with."

The unions' actuary, Thomas Lowman, presented the unions' counterproposal at the June 2010 hearing.[11] Mr. Lowman told the lawmakers: "We acknowledge the [P]lan is in trouble; we acknowledge that that trend line has to come down." Mr. Lowman further acknowledged that the City was unable to fund the "true cost" of the Plan if the post-retirement investment assumption were dropped to five percent: "$165 million; that's the true cost of the benefits if you don't do anything. We know you can't afford that."

---

[10] At the time that the legislation was being considered, Mr. Cherry was the President of Lodge 3, the City's chapter of the Fraternal Order of the Police.

[11] Eight years later, Mr. Lowman would testify as one of Appellants' expert witnesses at trial.

14

On June 21, 2010, the City Council voted to adopt Bill 10-0519. Mayor Rawlings-Blake signed the bill into law as Ordinance 10-306 (hereinafter sometimes referred to as the "Ordinance" or "10-306"), effective June 30, 2010. Ordinance 10-306 modified the terms of the Plan in several important respects. First, it replaced the fully market-driven Variable Benefit with a "0-1-2" age-based COLA. Under that tiered COLA, a retiree member (or beneficiary) age 54 or younger on June 30 receives no increase; a 1% increase is paid to those aged 55 to 64 years as of June 30; and a 2% increase is paid to those aged 65 and older as of June 30.[12]

Second, under the Ordinance, for the first time, the City became a guarantor of all COLAs and past Variable Benefit increases.

Third, it amended Article 22 to include a $16,000 minimum annual benefit for spousal beneficiaries of pre-July 1, 1996 retirees who completed 20 or more years of service. Prior to the enactment of Ordinance 10-306, the Plan included no benefit floor for retiree members or their beneficiaries.

Fourth, it changed the Service Retirement eligibility requirements. Prior to the enactment of the Ordinance, Service Retirement eligibility depended on the date an employee became a Plan member. For those who became Plan members on or before June

---

[12] After the City's actuaries advised that the City could not afford a 2% COLA, as requested by the unions, Thomas Taneyhill (the Plan's Executive Director) developed the 0-1-2 COLA in an effort to ensure retirees who are least likely to have other income streams receive a raise when most needed in their stage of life. According to Mr. Taneyhill, "if you're trying to get to a place that's affordable that we can sustain that tries to get the best benefit for the most people, that's why that was picked."

30, 2003, Service Retirement was available upon the earlier of reaching age 50 or completing 20 years of service. For those who became Plan members on or after July 1, 2003, Service Retirement was available upon the earlier of reaching age 50 with at least 10 years of covered fire and police ("F&P") service, or completing 20 years of service of which at least 10 years was covered F&P service.

Following the effective date of Ordinance 10-306, Service Retirement eligibility was bifurcated into those who are grandfathered into pre-10-306 eligibility criteria and those who are not. Members who met pre-10-306 Service Retirement eligibility as of June 30, 2010, as well as members with 15 or more years of covered F&P service as of June 30, 2010, are grandfathered into pre-10-306 Service Retirement eligibility criteria. All other Active members are subject to 10-306 normal Service Retirement criteria, under which members become eligible for Service Retirement upon the earlier of completion of 25 years of continuous F&P service, or reaching age 55 with a minimum 15 years of continuous F&P service. In addition, Ordinance 10-306 created a new early retirement benefit that enables non-grandfathered members to retire at their pre-10-306 Service Retirement eligibility date, or any date thereafter (but before their post-10-306 Service Retirement eligibility date), subject to a statutory benefit reduction formula.

Fifth, Ordinance 10-306 changed the amounts that members must contribute to the Plan. Prior to 10-306, Plan members were required to contribute 6% of their regular pay toward the Plan. Ordinance 10-306 modified this to a 7% contribution, with a gradual increase to 10% by 2013: a) as of July 1, 2010, 7% of regular pay; b) as of July 1, 2011,

8% of regular pay; c) as of July 1, 2012, 9% of regular pay; and d) as of July l, 2013, 10% of regular pay.

Sixth, Ordinance 10-306 changed the investment earnings assumption. Prior to 10-306, the Plan operated under a two-tiered "Regular interest" investment earnings assumption for valuation purposes (which figured into the annual City contribution): 8.25% on pre-retirement assets and 6.8% on post-retirement assets. Ordinance 10-306 modified the investment earnings assumption to a straight 8% on all assets.

Seventh, the Ordinance modified the Plan's deferred retirement option, known as "DROP 2." The original Deferred Retirement Option Plan ("DROP") was instituted in 1996 to enable retirement-eligible members to continue in active service without sacrificing the pension benefits they would have received in retirement. This system enabled those eligible for retirement with 20 or more years of service to remain in active duty and collect both their regular salaries plus the sum of what would have been their retirement benefit. Upon retirement, DROP funds were available to members for full withdrawal or as add-ons to monthly benefit payments. DROP was originally adopted on a five-year trial basis under the assumption that it would cost the City a one-time payment of $6 million. Upon review after the initial five years, it was clear that DROP was costing the City several million dollars per year. The City renegotiated with Plan members and instituted DROP 2 in 2009. DROP 2 was available to Plan members with 20 or more years of service as of December 31, 2009, as well as to Plan members hired on or after January 1, 2010 upon completion of 20 years of continuous F&P service.

17

Under 10-306, DROP 2 eligibility was bifurcated. Members with 15 or more years of covered F&P service as of June 30, 2010, are grandfathered into pre-10-306 DROP 2 eligibility criteria upon completing 20 or more years of service. Members with fewer than 15 years of covered F&P service as of June 30, 2010, are not grandfathered in and attain DROP 2 eligibility upon completion of 25 or more years of covered F&P service.

Finally, Ordinance 10-306 modified the definition of Average Financial Compensation ("AFC"). AFC is used to determine the member's retirement benefit amount. Prior to Ordinance 10-306, a member's AFC was the average annual regular pay earnable by a member for the 18 consecutive months during which pay was highest. Following the effective date of Ordinance 10-306, a member's AFC depended upon whether or not the member was grandfathered into the pre-10-306 AFC definition. Members with 15 or more years of covered F&P service as of June 30, 2010, are grandfathered into the pre-10-306 AFC definition. Members with fewer than 15 years of covered F&P service as of June 30, 2010, are not grandfathered in. Under 10-306, AFC is the average annual regular pay earnable by a member for the 36 consecutive months during which pay was highest.

## B. The Federal Lawsuit

Appellants, along with unions that represent them (collectively, the "Federal Plaintiffs"), filed a class action lawsuit against the City and the Board in the United States District Court for the District of Maryland in June 2010. The Federal Plaintiffs asserted both federal and state law claims based on what they claimed was the City's failure to fund the Plan and on the change in benefits and other modifications to the Plan effected by

18

Ordinance 10-306. Against the City, among other claims, they alleged a violation of the Takings Clause of the United States Constitution,[13] contending that the City's elimination of the Variable Benefit was a taking without just compensation. They also alleged that the City's actions violated the Contract Clause of the Constitution,[14] and brought a state law breach of contract claim against the City and the Board.

After holding two hearings, the federal district court ruled that the substitution of the COLA for the Variable Benefit substantially impaired the contract rights of the groups we refer to here as the Retired and the Retirement-Eligible Sub-classes. *Cherry v. Mayor & City Council of Balt. City*, No. CV MJG-10-1447, 2011 WL 11027560, at *7-8, *14 (D. Md. Sept. 6, 2011). The district court found no Contract Clause violation as to the group we refer to as the Active Sub-class. *Id.* at *8, *14. The district court invalidated the portion of the Ordinance eliminating the Variable Benefit and instituting the 0-1-2 COLA, finding an "unconstitutional impairment" of the rights of the Retired and the Retirement-Eligible Sub-classes. *Cherry v. Mayor & City Council of Balt. City*, No. CV MJG-10-1447, 2012 WL 4341446, at *13 (D. Md. Sept. 20, 2012). The district court dismissed the plaintiffs'

---

[13] The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Takings Clause of the Fifth Amendment against the States. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005).

[14] The Contract Clause is included in Article I, Section 10 of the United States Constitution. It provides: "No State shall … pass any … Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1.

Takings Clause claim as moot, and granted the parties' agreed motion for a voluntary dismissal without prejudice of the state law claims.

Both parties appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed in part and vacated in part the district court's judgment. *Cherry v. Mayor & City Council of Balt. City*, 762 F.3d 366 (4th Cir. 2014). The Fourth Circuit held that the Plan members' rights under the Contract Clause were not impaired, because the members retained a state law remedy for breach of contract. *Id.* at 371-74. Thus, the court affirmed the district court's judgment to the extent the lower court had held that the Federal Plaintiffs could not prevail under the Contract Clause, and vacated the judgment to the extent it had granted relief to the retired and retirement-eligible members with respect to the substitution of the COLA for the Variable Benefit.

Given its holding concerning the Contract Clause claim, the Fourth Circuit vacated the district court's order dismissing the Takings Clause claim as moot and remanded the case to the district court to decide that claim. *Id.* at 374. In a footnote, the Fourth Circuit stated: "The plaintiffs may attempt to refile in the district court their state law claims that were dismissed without prejudice, or they may initiate proceedings in state court alleging breach of contract under Maryland law. If the plaintiffs choose to pursue either of these two courses of action, the district court may wish to hold any proceedings regarding the Takings Clause claim in abeyance pending the resolution of related contractual issues." *Id.* at 374 n.6.

On remand, the district court found that the state law claims present novel and complex issues of state law, and that state law issues predominate; therefore, the court

20

declined to exercise supplemental jurisdiction over the state law claims. *Cherry v. Mayor & City Council of Balt. City,* No. CV MJG-10-1447, 2016 WL 3955928, at \*3 (D. Md. July 22, 2016). On August 1, 2016, Judge Garbis stayed the remaining federal Takings claim and directed the parties to state court to resolve the state law claims. *See id.*

## C. State Court Proceedings

On August 16, 2016, Appellants filed a Class Action Complaint against the City in the Circuit Court for Baltimore City. On November 28, 2017, Appellants filed a First Amended Class Action Complaint. The putative class included all members and beneficiaries of the Plan as of June 30, 2010 (the date of enactment of Ordinance 10-306). The First Amended Complaint further alleged the existence of the three subclasses described above: (i) the Retired Sub-class, which includes all members and beneficiaries of the Plan who, as of June 30, 2010, were entitled to, and receiving, retirement benefits under the Plan; (ii) the Retirement-Eligible Sub-class, which includes all members of the Plan who, as of June 30, 2010, were eligible to retire but not entitled to receive benefits because they were continuing to work; and (iii) the Active Sub-class, which includes all members of the Plan who, as of June 30, 2010, were working and not yet eligible to retire.

In Count One of the Amended Complaint, Appellants asserted a claim for a declaratory judgment, and specifically sought declarations on 14 points, including that "[t]he City, by adopting Ordinance 10-306, breached its contract with the members of the Plan." In Counts Two, Three, and Four, the Retired Sub-class, the Retirement-Eligible Sub-class, and the Active Sub-class, respectively, claimed for breach of contract. All three sub-classes alleged that the City breached its contract with them, first, by underfunding the Plan

21

and, second, by enacting Ordinance 10-306. All three sub-classes demanded monetary damages in an amount to be determined at trial, equitable relief, specific performance, attorneys' fees, costs, and interest.

On January 2, 2018, the circuit court, on cross-motions for summary judgment, ruled that the City breached its contract with the Retired Sub-class and Retirement-Eligible Sub-class members by removing the Variable Benefit feature of the Plan and replacing it with an age-tiered COLA, and that a trial was necessary to calculate the damages suffered by these Plan members. The circuit court based its ruling on its determination that members of the Retired and Retirement-Eligible Sub-classes, having satisfied all of the contractual conditions precedent to receipt of benefits under the Plan prior to the adoption of Ordinance 10-306, held vested rights to Plan benefits that the City could not lawfully unilaterally diminish or impair.

With respect to the Active Sub-class, the circuit court ruled that, under *City of Frederick v. Quinn*, 35 Md. App. 626 (1977), the City had the power to unilaterally modify the terms of the Plan, including the benefits provided, so long as (i) such modifications were prospective and not retrospective and (ii) reasonable. The court further concluded that, as to the Active Sub-class, the modifications were prospective because members of the Active Sub-class had not yet fulfilled the conditions precedent to be eligible to receive benefits under the pre-10-306 structure. Therefore, the Active members did not have a vested right to receive the Variable Benefit when they reached retirement eligibility. The circuit court concluded that a trial would be necessary to determine whether Ordinance 10-306's modifications, as to the Active Sub-class, were reasonable.

The circuit court conducted a bench trial to resolve the remaining issues beginning on October 29, 2018. Several expert witnesses testified for both sides. Closing arguments occurred on January 4, 2019. On May 13, 2019, the circuit court entered a Declaratory Judgment and Order, accompanied by a 144-page Memorandum Opinion explaining the bases for its rulings. With respect to the Active Sub-class, the court concluded that Ordinance 10-306 was reasonably intended to preserve the pension system by enhancing its actuarial soundness; therefore, the City did not breach its contract with the Active Sub-class by enacting the Ordinance.

Additionally, the court concluded that the City did not breach its contract with any Plan members by underfunding the Plan. In reaching this conclusion, the court relied on the plain language of the Plan in which there was no intention or requirement for it to be fully funded.

In terms of the proper remedy for the breach of the contract with the Retired and Retirement-Eligible Sub-classes, the court determined that returning to the Variable Benefit for those members would be unworkable and thus the court declined to award specific performance. Instead, the court stated that it would award damages in the amount that members of these sub-classes would have received, or been entitled to receive under the Variable Benefit system, from the date Ordinance 10-306 was passed through final judgment by the court. To calculate this figure, the court accepted the findings of the City's expert witness, concluding that his assumptions were sound and reflected historical reality. The court rejected the assumptions proffered by Appellants' expert witnesses, finding that they would result in an improper windfall for the Retired and Retirement-Eligible Sub-

23

classes. The circuit court ultimately awarded more than $30 million in damages to specific members of the Retired and Retirement-Eligible Sub-classes. However, under the damages model proposed by the City's expert and accepted by the circuit court, many members of those sub-classes received no damages because they were found to have received no less compensation under the 0-1-2 COLA than they would have received under the Variable Benefit.

Appellants noted an appeal of the circuit court's judgment to the Court of Special Appeals. The City subsequently noted a cross-appeal. On September 8, 2020, before the parties had filed any briefs in the intermediate appellate court, Appellants filed a petition for *certiorari* in this Court. On November 10, 2020, we granted the petition. *Cherry v. Mayor & City Council of Balt. City*, 471 Md. 262 (2020). We have condensed and rephrased the questions the parties have presented in their cross-appeals as follows:

1. Did the circuit court properly conclude that the City did not breach its contract with the members of the Plan by "underfunding" the Plan?

2. Did the City breach its contract with any of the sub-classes by adopting Ordinance 10-306?

3. Did the circuit court err in its calculation of monetary damages owed to the Retired and Retirement-Eligible Sub-classes?

## II

### Standard of Review

Maryland Rule 8-131(c) governs appellate review of a circuit court's findings and judgment after a bench trial:

**(c) Action Tried Without a Jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the

evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Under Maryland Rule 8-131(c), we "must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence." *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657, 676 (2007) (citations omitted); *Urban Site Venture II Ltd. P'ship v. Levering Assocs. Ltd. P'ship*, 340 Md. 223, 230 (1995); *see also Leavy v. Am. Fed. Sav. Bank*, 136 Md. App. 181, 199-200 (2000) (an appellate court "may not reassess the credibility of [an] expert witness, or the weight of [their] testimony. That is quintessentially a job for the trial court sitting as a fact-finder in [the] bench trial. *See* Md. Rule 8-131(c). In deciding whether there is sufficient evidence to support the trial court's factual finding, we assume the truth of all the evidence relied upon by the trial court, and of all favorable inferences fairly deducible from that evidence."). "If there is any competent evidence to support the factual findings [of the trial court], those findings cannot be held to be clearly erroneous." *Della Ratta v. Dyas*, 414 Md. 556, 565 (2010) (citation and internal quotation marks omitted); *Solomon v. Solomon*, 383 Md. 176, 202 (2004); *see also Leavy*, 136 Md. App. at 200 ("[I]f there is any competent, material evidence to support the factual findings below, the weight and value of such evidence must be left to the trier of facts, as it is not our function to determine the comparative weight of conflicting evidence.") (alteration in original) (citation omitted).

We review the circuit court's legal conclusions without deference. *See, e.g.*, *Plank v. Cherneski*, 469 Md. 548, 569 (2020).

Discussion

## A. The Alleged Breach of Contract by "Underfunding"

Appellants argue that the City breached the contract by "underfunding" certain parts of the Plan. In the circuit court, as summarized by the court, Appellants based their claim on the following allegations: (1) failure of the City to adopt the Plan actuary's recommendations to reduce the 6.8% post-retirement asset earnings assumption rate (which enabled the City to avoid the resultant increase in required contributions during the relevant period); (2) use of the actuarial technique of "double smoothing" the losses sustained following the technology bubble burst in 2001-02 (which delayed recognition of those losses and, therefore, depressed the City's required contributions during the period at issue in this case); and (3) failure to recognize losses resulting from the 2008-09 Great Recession by adopting Ordinance 10-306 instead of fully funding the ARF and PRF as required by §§ 36 and 37 of Article 22.

The circuit court rejected these contentions, holding that the sections of the Plan upon which Appellants relied, "read individually or as a cohesive unit, … do not create an obligation on the part of the City to fully fund the Plan." The circuit court further found that "[i]n addition to the absence of an affirmative obligation to maintain the Plan in a fully funded state, provisions of the Plan at sections 33, 36 and 37 are fundamentally at odds with such an obligation." According to the circuit court:

> If the legislature had intended the meaning Plaintiffs attribute, the Plan would require that at all times the Plan be "fully funded," to use [Appellants'] language, or the equivalent. Likewise, the legislature would not have

afforded the City entitlement to exercise discretion in consultation with industry professional advisors regarding, among other things, the proper methods of accounting for losses and gains.

Thus, the circuit court concluded that Appellants' argument lacked merit:

> The language of the Plan is plain and clear. It does not give rise to multiple meanings; nor is its meaning doubtful. Therefore, the court finds that the legislature did not intend to require that the City maintain the Plan in a "fully funded" state as Plaintiffs contend; and the Plan did not so require on the effective date of Ordinance 10-306 or at any time at issue in the Amended Complaint. Specifically, Plaintiffs (Class members) have failed to satisfy their burden to demonstrate that the City breached its contractual duties to any of the three Sub-Classes by 1) failing to lower the post-retirement earnings assumption rate from 6.8%; 2) double smoothing the tech bubble losses; or 3) legislatively modifying the Plan following the Great Recession (and not "fully funding" the ARF and the PRF).

Before this Court, Appellants argue that the circuit court misunderstood their position regarding fully funding the Plan. Appellants explain that they do not claim the entire Plan must be fully funded – only that the "retiree reserves" (the ARF and the PRF) upon which Variable Benefits are determined must be fully funded at the beginning of each fiscal year to ensure optimal circumstances for Variable Benefit distributions in a given fiscal year. Failure to fully fund retiree reserves, Appellants contend, "reduce[s] the assets upon which a [Variable Benefit] would be calculated and so reduce[s] [Variable Benefit] increases, breaching the City's promise not to diminish or impair benefits."

The City counters that the circuit court properly rejected Appellants' argument because there is nothing in the statutory language of the Plan that requires the City to "fully fund" retiree reserves, and, to the contrary, Article 22 permits the City *not* to fully fund retiree reserves. We agree with the City on this point.

To ascertain whether the City's level of funding of the PRF[15] breached the contract between the members of the Plan and the City, we must construe the relevant provisions of the Plan, as set forth in Article 22. As we have often stated, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the actual intent of the [legislative body] in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). If the statutory language "is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Id.* at 275. "However, we do not analyze statutory language in a vacuum." *Collins*, 468 Md. at 689-90. "Rather, statutory language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 690 (internal quotation marks and citation omitted). We presume that the legislature "intends its enactments to work together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (internal quotation marks and citation omitted); *see also*

_____

[15] Although retiree reserves include both the ARF and the PRF, the City's contributions end up in the PRF after a member retires. The ARF holds the member's contributions. Thus, we focus here on the PRF, as have the parties, when discussing Appellants' underfunding claim.

28

*Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302-03 (2001) ("[W]hen interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme."). Where statutory language is ambiguous and thus subject to more than one reasonable interpretation, or where the language is unambiguous when read in isolation, but ambiguous when considered in the context of a larger statutory scheme, "a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Lockshin*, 412 Md. at 276 (citations omitted).

We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes. *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 331 (2010). The plain language of the local ordinance is the primary source of legislative intent. *O'Connor v. Baltimore Cty.*, 382 Md. 102, 113 (2004). In determining the legislative intent of a local ordinance, we assign the words of the ordinance "their ordinary and natural meaning and avoid adding or deleting words to impose a meaning inconsistent with the plain language" of the measure. *120 W. Fayette St.*, 413 Md. at 331 (quoting *O'Connor*, 382 Md. at 113-14). Moreover, "a court must read the language of the charter or ordinance in context and in relation to all of its provisions[.]" *Id.* (quoting *Howard Research Dev. Corp. v. Concerned Citizens for the Columbia Concept*, 297 Md. 357, 364 (1983)).

Initially, we observe that the circuit court, in fact, considered and rejected Appellants' contention that the City breached the contract by not fully funding retiree reserves. In her Memorandum Opinion of May 13, 2019, Judge Rubin summed up her ruling against Appellants on this claim by stating (after explaining how the various pertinent parts of Article 22 work together): "Plaintiffs (Class members) have failed to satisfy their burden to demonstrate that the City breached its contractual duties to any of the three Sub-Classes by … not 'fully funding' the ARF and the PRF[.]"

We agree with the circuit court's analysis. Nothing in the plain language of Article 22 requires the City to "fully fund" retiree reserves. And § 36(d), which governs the calculation of the City's annual contribution to the Fund, demonstrates that the City Council did not intend to require the City to maintain funds in the PRF at any given time that were sufficient to pay all pension benefits to which Plan members would be entitled over time.

As stated above, the City's annual contribution to the Plan consists of a "normal contribution" and an "accrued liability contribution." Art. 22, § 36(d)(2). Subsection 36(d)(3) provides further detail regarding the first of these two components:

> On the basis of regular interest and of such mortality and other tables as shall be adopted by the Board of Trustees, the actuary engaged by the Board shall make a valuation to determine the required contribution by the City … to the Pension Accumulation Fund. The actuary shall determine a normal cost for each employee which is equal to the amount of annual contribution which is necessary to provide his benefit if such contributions had been made annually from his date of employment to his date of retirement. The total of amounts so determined shall be known as "normal cost contribution".

30

Subsection 36(d)(4) then provides further requirements concerning the second of the two components, the "accrued liability contribution":

(i) For each employee, the Board of Trustees shall calculate an accrued liability equal to the accumulation of the annual normal cost contribution described in paragraph (3) of this subsection from date of employment to the valuation date on the basis of the actuarial assumptions adopted by the Board of Trustees.

(ii) The accrued liability [thus] calculated … shall be added to the reserve for retirement benefits payable to retired members from the Pension Accumulation Fund to obtain the total accrued liability.

(iii) The assets of the Pension Accumulation Fund shall be applied against the total accrued liability calculated for all participants to determine the amount of *unfunded accrued liability.*

(iv) If the total accrued liability exceeds the assets in the Pension Accumulation Fund, *an accrued liability contribution shall be determined as the amount that is sufficient to meet regular interest on the unfunded accrued liability and to amortize the principal of the unfunded accrued liability over the period determined by the Board of Trustees.*

(v) If the assets in the [PAF] exceed the total accrued liability, the excess assets shall be amortized over the period determined by the Board of Trustees to reduce the required contribution by the City of Baltimore.

(Emphasis added).

Subsection 36(d)(5) then reiterates that these two components constitute the City's required contribution ("The required contribution by the City … is the amount equal to the normal cost, plus the accrued liability contribution or less the amortization of the excess assets, as the case may be."), but crucially provides that "the aggregate payment by the City must be sufficient, when combined with the amount in the fund, to provide the pensions and other benefits payable out of the fund during the then-current year."

31

Thus, subsections 36(d)(2) through (5) provide the framework for determining the amount of the City's contribution to the Plan: (i) a normal cost component related to the value of benefits earned in the year for each working employee; and (ii) an *unfunded actuarial liability* component related to the amount by which the Plan is underfunded, the sum of which must be at least the amount needed to pay the pensions and other benefits due to members in the "then-current year."

As the City observes, subsection 36(d)(4)(iv) "directs that unfunded liability is addressed like a mortgage – the City makes regular payments of interest and principal over a specified term and at a specified interest rate." On the other hand, if the assets in the PAF exceed the total accrued liability, subsection 36(d)(4)(v) requires the amortization of the excess assets to reduce the City's contribution.

Thus, § 36(d) contemplates the possibility of either underfunding or overfunding of the Plan. This convinces us that Appellants are incorrect in contending that Article 22 prohibits underfunding of retiree reserves necessary to pay all benefits to which Plan members will be entitled over time. To the contrary, Article 22 requires funding in any given year that is sufficient to pay the pensions and other benefits due to members in the "then-current year." *Id.* § 36(d)(5). It is undisputed that the City never breached its obligation to pay all pensions and benefits due to members in any given year.

Appellants attempt to avoid the import of § 36(d)'s various provisions by arguing that § 36(d) only governs the PAF, not the PRF. According to Appellants, § 36(d)'s contemplation of potential underfunding only applies to the amounts necessary to make direct payments from the PAF to those Plan members who retired with "Prior Service"

credit – *i.e.*, Plan members who retired from service prior to January 1, 1926. In support of this proposition, Appellants note that Plan members who retired from service after January 1, 1926, receive payments from the PRF (and the ARF), not the PAF.

Appellants' argument distinguishing between the PAF and the PRF lacks merit. Appellants do not point to any language in Article 22 that requires the City to fund the PRF at a greater rate than the PAF. Notably, § 36(d)(7) describes the transfer of funds from the PAF to PRF – "on the retirement of a member" in "an amount equal to the member's pension reserve." The plain language of this subsection does not impose an obligation to maintain the PRF in a fully funded state at all times or require additional contributions to remedy investment losses immediately when they occur. Further, § 36(d)(5), not § 36(d)(7), operates to ensure compliance with the guaranty of § 37 by requiring the City's contribution to be sufficient, accounting for the actuarial condition of the PAF, to remedy any deficiency in the funds to pay out pensions in the then-current year.

In addition, the structure and content of § 36(d) as a whole does not support an interpretation that § 36(d)(5) only applies to benefits promised to public safety employees retired prior to January 1, 1926, especially given that the language contained in § 36(d) has remained in the Plan despite numerous amendments to Article 22 since 1962. It seems impossible that any currently living Plan members retired from service prior to January 1, 1926. The idea that the City Council would retain detailed explanations in § 36(d) concerning the interplay of "normal contributions" and "accrued liability contributions" that would have no practical effect on any living Plan member – even after amending

33

Article 22 as late as 2003[16] – is far-fetched. It is much more likely that the City Council intended the provisions of §§ 36(d)(2) through (d)(5) to apply to all Plan members, regardless of when they retire from service. This conclusion is reinforced by § 36(d)(1), which defines the PAF as "the fund in which shall be accumulated *all reserves* for the payment of *all pensions* and other benefits payable from contributions made by the City[.]" (Emphasis added). The PRF is housed within the PAF. The fact that funds equal to a Plan member's pension reserve are transferred from the PAF to the PRF when the member retires, *see id.* § 36(d)(7), does not demonstrate the City Council's intent to apply a different set of funding rules for the PRF that the City Council has conspicuously not defined anywhere in Article 22.

We agree with the circuit court that, had the City Council intended to require full funding of the Plan (or specific funds within the Plan) at all times, then the plain language of the relevant provisions governing funding would demonstrate such an intent. *See, e.g.*, *In re Walker*, No. 8, Sept. Term 2020, slip op. at 23 (Md. Mar. 30, 2021) ("If the General Assembly had intended for the MCLA to permit continuing liens, as an expedient mechanism for securing future condominium association costs and fees, it could have said so in the statute."); *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 317 (2017) ("Presumably, had the General Assembly intended to include the requirement that a DRRA be supported by enhanced public benefits, the General Assembly

---

[16] In 2003, the City Council modified § 36(d), making what appeared to be stylistic changes to subsection (d)(5). *See* Balt., Md., Ord. 03-576 (2003).

34

would have taken care to define the term 'enhanced public benefit,' or otherwise delineate what would constitute an enhanced public benefit. Absent any indication in the relevant statutory language or the legislative history that the General Assembly intended that a DRRA be supported by enhanced public benefits, we decline to construe the DRRA statute to reach such a strained result."); *Montgomery Cty. v. Phillips*, 445 Md. 55, 76 (2015) ("Tellingly, the General Assembly could have, but did not, modify or otherwise raise the tax ceiling on the combined State agricultural land transfer tax and county agricultural land transfer tax that may be imposed.").

Finally, we reject Appellants' attempt to discern legislative intent to "fully fund" the PRF by arguing that the failure to do so "is to reduce the assets upon which a [Variable Benefit] would be calculated and so reduce [Variable Benefit] increases, breaching the City's promise not to diminish or impair benefits." The City was not required under Article 22 to contribute more than § 36(d) dictates in order to create a larger Variable Benefit in any given year. Indeed, under § 36(d)(4)(v), the City Council directs that, if assets in the PAF exceed the total accrued liability, the excess assets shall be amortized to reduce the required contribution by the City. In short, the City did not have an obligation to use excess assets to inflate the value of the PRF to maximize the amount of the Variable Benefit.

For the above reasons, we affirm the circuit court's ruling that the City did not breach its contract with the Plan members by underfunding the Plan.

**B. The Alleged Breach of Contract Through Enactment of Ordinance 10-306**

The circuit court ruled that, by enacting Ordinance 10-306, the City breached its contract with the Retired and Retirement-Eligible Sub-classes, but did not breach the

35

contract it had made with the members of the Active Sub-class. Appellants agree with the former ruling and disagree with the latter. Not surprisingly, the City agrees with the latter determination and disagrees with the former. As discussed below, we agree with the circuit court as to both conclusions.

1.  Maryland Caselaw Concerning a Government's Power to Change a Pension Plan

For almost 50 years, it has been settled that, under Maryland law, a "municipal corporation[] may make reasonable modifications of a pension plan at any time before the happening of the defined contingencies" in that plan. *Saxton v. Bd. of Trs. of the Fire & Police Emps. Ret. Sys.*, 266 Md. 690, 694 (1972). This Court's decision in *Saxton* is generally cited for that proposition. *See, e.g.*, *Baker v. Baltimore Cty.*, 487 F. Supp. 461, 468 (D. Md. 1980); *Quesenberry v. Washington Suburban Sanitary Comm'n*, 311 Md. 417, 423 (1988); *Bd. of Fire Comm'rs v. Potter*, 268 Md. 285, 295 (1973); *Davis v. City of Annapolis*, 98 Md. App. 707, 719 (1994).

The issue in *Saxton* was whether the deceased firefighter's widow (Mrs. Saxton) was entitled to a special death benefit upon the death of her husband (Lieutenant Saxton). Lieutenant Saxton worked for the Baltimore City Fire Department from 1940 through 1969. In May 1968, he suffered incapacitating injuries in the line of duty. 266 Md. at 691. On May 7, 1969, he was involuntarily retired and was awarded a "special disability benefit" under the then-applicable provision of the Plan, Article 22, § 34(e) (1966). *Id.* On January 1, 1970, Lieutenant Saxton died as a result of his injuries. Mrs. Saxton subsequently filed

an application with the Board of Trustees for a "special death benefit" under § 34(i). *Id.* at

692. The Plan's "special death benefit" provision in effect at the time stated:

> Upon the receipt of proper proofs of the death of a *member in service* arising out of and in the course of the actual performance of duty ... there shall be paid: (1) [to his designated beneficiary, and if none, to his estate, his accumulated contributions and a pension of 100% of his current compensation] (2) To his widow to continue during her widowhood …

*Id.* (quoting Art. 22, § 34(i) (1966) (emphasis and alterations by the Court)). The Board

denied Mrs. Saxton's claim, and Mrs. Saxton then filed a mandamus action to require the

Board to award the special death benefits to her. *Id.* at 691-92.

On appeal to this Court, Mrs. Saxton noted that prior versions of what became

§ 34(i) (its "progenitors," as the Court put it) did not "limit[] entitlement to death benefits

in instances where death occurred in service, if it were occasioned by injuries sustained in

the line of duty." *Id.* at 693. Mrs. Saxton argued that "a pension law, being remedial

legislation, should be liberally construed," *id.* at 694, and therefore, notwithstanding the

qualifying language in § 34(i), the Court should interpret § 34(i) in keeping with the City

Council's prior demonstrated intent not to withhold death benefits from spouses of

decedents who retired from service but later died of injuries incurred in the line of duty.

*See id.* at 693-94.

This Court affirmed the denial of mandamus, reasoning that there was no ambiguity

in the language of the special death benefit provision in the 1966 version of the Code. *Id.*

at 694.[17] We stated that "the right to a pension depends upon the controlling statutory provisions and the claimant must satisfactorily perform and meet all conditions precedent." *Id*. Mrs. Saxton was not entitled to the special death benefit because Lieutenant Saxton did not fulfill the condition precedent set forth in § 34(i) – *i.e.*, he was not a member in service at the time of his death. *Id.* at 693-94. Pertinent to this case, the *Saxton* Court stated: "The ground rules here, to put it quite simply, were changed prior to the date when Lieut. Saxton sustained his injuries. In all states municipal corporations may make reasonable modifications of a pension plan at any time before the happening of the defined contingencies[.]" *Id.* at 694.

*Saxton* stands for the proposition that a government employer may make reasonable modifications to its pension plan at any time before an event gives rise to an employee's right to receive benefits ("the happening of the defined contingencies"). *Id. Saxton* also teaches that the employee must satisfy all conditions precedent set forth in the Plan (*i.e.*, the defined contingencies) to become entitled to receive the promised benefits. *Id.* In *Saxton*, the defined contingency in § 34(i) was "the death of a member in service arising out of and in the course of actual performance of duty." *Id.* at 692. Thus, if Lieutenant Saxton had died of his injuries before being involuntarily retired, Mrs. Saxton would have been entitled to the special death benefit.

---

[17] The Court did not state when § 34(i) – and its language restricting the special death benefit to designated beneficiaries and widows of "members in service" – was added to Article 22. Our research reveals that it was added in 1962. *See* Balt., Md., Ord. 62-1285 (1962).

In *Saxton*, the Court did not consider whether the prospective modification of the benefit was reasonable. Thus, the Court offered no guidance about how to gauge reasonableness in the context of a prospective pension modification. Nor was the Court faced with a situation involving retrospective divestment of pension rights following the employee's performance of all conditions precedent.[18]

In *City of Frederick v. Quinn*, the Court of Specials Appeals considered both of those issues. In 1951, the City of Frederick adopted a noncontributory retirement and disability plan in Article XVI, Section 196 of its Charter. It repealed and replaced that plan with a contributory commercial insurance plan in 1961. 35 Md. App. at 628. Five police officers who had been covered under the old plan, and who declined enrollment in the new plan, sued the City of Frederick, seeking a declaratory judgment that they were entitled to benefits under the prior plan.[19] *Id.*

The prior plan provided:

Any policeman, including the Chief of Police, who is in good standing and who has served on the force for a period of 20 consecutive years, including the years of service of any policeman now on the force, provided they are consecutive, and who has been retired from active service as provided in

---

[18] The Court would have been presented with such a case if: (1) at the time of Lieutenant Saxton's death the special death benefit provision in § 34(i) had *not* required that the employee have died while a "member in service" and the City therefore had begun making pension payments to Mrs. Saxton after her husband's death; (2) a subsequent amendment added the "member-in-service" requirement to § 34(i); and (3) the City took the position that the amendment permitted it to stop making pension payments to Mrs. Saxton.

[19] The plaintiffs in *Quinn* initially also sought damages under a breach of contract theory. However, for reasons not explained in the Court of Special Appeals opinion, the breach of contract claim was dismissed. *Quinn*, 35 Md. App. at 628 & n.1.

Section 196 shall be paid, for life, a sum of money equal to one-half of a prevailing salary, payable in semimonthly installments. Any policeman retired as provided in Section 196 who shall not have served on the force for a period of 20 years shall be paid, for life, a sum of money prorated in the proportion that the years he has served as a policeman bears to the whole period of 20 years.

*Id*. Ruling in favor of the police officers, the lower court held that the officers, "by virtue of their service to the City of Frederick prior to the repeal of Article XVI, Section 196 of the City Charter, had vested pension rights as set forth therein which still remain in effect and cannot be modified, repealed or defeated by the City's unilateral acts." *Id.* at 627 (internal quotation marks omitted).

The Court of Special Appeals vacated the lower court's judgment. The court began its analysis by "[t]racing the evolution of theories in the decisional law of public employee statutory pension rights," *id.* at 629, from which the court discerned two general approaches in this area: (1) a majority of states treated pension "rights" merely as "gratuities which a gracious and beneficent governmental employer may confer, withhold, modify or repeal as the whim of an omniscient sovereign dictates"; and (2) a minority of states had adopted "a basic concept of contractual rights that vest at time of employment," but this latter group was "divided upon the extent to which the rights vest in the employee." *Id.*

The *Quinn* Court explained that the lower court had followed "the strict contract theory, holding that when the pension rights vested upon employment or adoption of the plan those rights were immune from prospective legislative impairment." *Id.* The intermediate appellate court disagreed with this strict contract approach, opining that the lower court's "holding goes too far," but the court nevertheless agreed "that a pension is

40

more contractual than gratuitous." Writing in 1977, the court stated: "Having barely concluded the 200th anniversary of our experiment in a democracy that wrenched itself from monarchical rule, it is absurd to speak of a pension as 'a bounty springing from the appreciation and graciousness of the sovereign'. The medieval or even colonial concepts of a compassionate and generous sovereign rewarding his humble, devoted subjects is completely alien to our modern views of a democratic government's obligations to its citizens." *Id.* at 629-30 (citation omitted).

"Only slightly less bemusing" to the court, however, was "the picture of a citizen whose contractual strength is so formidable" that a governmental employer "can neither terminate nor vary the terms of the employment contract which is the essence of the strict constructionists' views…. Such rigid interpretation is the inevitable pitfall of seeking pigeonholes with labels as substitutes for logic and common sense." *Id.* at 630.

Having found both the "gratuity" approach and the "strict contract" approach wanting, the Court of Special Appeals adopted an intermediate position that turned on whether the employee's right to a benefit had vested prior to the time of the pension plan modification. Key to the Court's resolution of the dispute before it was the fact that the prior noncontributory plan provided that the officers would earn pension benefits on a prorated basis as they served the City. To illustrate its point, the court analogized to employee salaries:

> It is reasonable to assume, as the court below found factually, that [the police officers] were induced, at least in part, to their employment by the pension benefits held out at the time, just as they were induced by the salary then offered. The future benefits vested as they were proratedly earned, just as the employee's rights to their salary vested as it was earned. Momentarily

assuming for argument that the City could terminate either or both of these benefits at its option, by doing so it would have no more right to withdraw retroactively the pro rata pension benefits that had accrued than it could demand repayment of the salary the employees had earned and had been paid. To that extent at least, especially in view of the proportionate prorating provision of Section 196, the pension rights vested absolutely. The provision acts as an express assurance to the employees that pension benefits they have earned by satisfactory service cannot be divested.

*Id.*

However, the court distinguished between pension rights that have vested and those that have not vested, reasoning that governmental employers may make reasonable changes to their pension plans that do not divest employees of pension benefits they have already earned:

[T]he analogy of earned salary and vested pension does not withstand prospective comparison. The pension plan is not immutable and the government-employer need not keep its provisions precisely intact. As government grows in size and complexity and as more employees draw from the fund, changes must often be made to assure the soundness of the fund and permit its growth commensurate with its prospective needs. The contractual or vested rights of the employee in Maryland are subject to a reserved legislative power to make reasonable modifications in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition. Each case where a changed plan is substituted must be analyzed on its record to determine whether the change was reasonably intended to preserve the integrity of the pension system by enhancing its actuarial soundness, as a reasonable change promoting a paramount interest of the State without serious detriment to the employee. In short, the employee must have available substantially the program he bargained for and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare.

*Id.* at 630-31 (citing with approval *City of Downey v. Bd. of Admin., Pub. Emps. Ret. Sys.*, 121 Cal. Rptr. 295, 303 (Ct. App. 1975)).

The court summed up its rule as follows: "If reasonable substitution is offered by an employer and it is declined by the employee, he is barred prospectively from further claims upon the rejected plan and is obviously not eligible to claim under the substitute plan. But the rights which have accrued under the terminated plan may not be retrospectively withdrawn from him." *Id.* at 631. The court observed that its line of demarcation between retrospective and prospective pension modifications was in accord with this Court's opinion in *Saxton*, based on *Saxton*'s references to the "ground rules" having changed before Lieutenant Saxton sustained his injuries, and to a municipal corporation's authority to "make reasonable modifications of a pension plan any time before the happening of the defined contingencies." *See id.* at 632-33 (quoting *Saxton*, 266 Md. at 694).

The intermediate appellate court remanded the case to the lower court to determine whether the new plan "was either necessary or reasonable when substituted." *Id.* at 634.

Since its issuance 44 years ago, *Quinn* has provided the most detailed explication of Maryland's law regarding legislative modifications to public pension plans. Its holding may be summed up by two principles that build upon *Saxton*. First, a public pension plan "is more contractual than gratuitous." *Id.* at 629, 633 (quoting *Food Fair Stores v. Greeley*, 264 Md. 105, 113 (1972)). We have reiterated this principle. *See Bd. of Trs. of Emps.' Ret. Sys. v. Mayor & City Council of Balt. City*, 317 Md. 72, 100 (1989) ("Under Maryland law, pension plans create contractual duties toward persons with vested rights under the plans."). Thus, when an employee becomes a plan member, the employee has a vested right

to receive a pension through satisfactory service to the government-employer. *Quinn*, 35 Md. App. at 630.

Second, while an employee's vested *benefits* may not be retrospectively eliminated, the employee's vested *right* to a pension is not immune to prospective modifications and the government-employer "need not keep its [pension plan] provisions precisely intact." *Id.* In other words, a government-employer is permitted to make reasonable prospective modifications to its pension plan, *id.* at 631, 633, subject to a determination as to whether the change was "either necessary or reasonable when substituted." *Id.* at 634. The modification will be upheld as reasonable if it bears "some material relation to the theory of a pension system and its successful operation" and any disadvantages to employees that result from the modification are offset by comparable new advantages, benefits, or liberalized qualifying conditions. *See id.* at 631. It will be upheld as necessary if it was "intended to preserve the integrity of the pension system by enhancing its actuarial soundness, as a reasonable change promoting a paramount interest of the State without serious detriment to the employee." *Id.* In other words, the substituted plan must be "substantially the program" the employee bargained for and, where a diminution in benefits is not balanced with a new advantage, the substitution must be "justified by countervailing equities for the public's welfare." *Id.*

Guided by these principles, in *Davis v. City of Annapolis*, the Court of Special Appeals concluded that an Annapolis City police officer was entitled to pre-modification plan benefits where the employee's rights had vested prior to the City's plan modification. 98 Md. App. 707. *Davis* involved a mandamus review following the Public Safety

44

Disability Retirement Board's decision denying Officer Davis disability retirement benefits for a service-related injury that occurred in 1989 and a re-injury in 1990. *Id.* The primary issue that the court resolved was whether the pre- or post-modification standard was applicable to determining his benefit eligibility.

Prior to Officer Davis's injuries and the modification at issue, the standard provided that an officer was entitled to the occupational disability retirement when that officer was "INCAPACITATED *PERMANENTLY* FROM ACTIVE SERVICE." *Id.* at 711. In 1991, the City passed an ordinance to amend the standard. *Id.* Under the amended standard, an officer would be eligible if the officer was "WHOLLY AND PERMANENTLY PREVENTED FROM ENGAGING IN ANY OCCUPATION ... OR ... WHOLLY AND PERMANENTLY PREVENTED ... FROM PERFORMING ANY JOB IN THE FIRE OR POLICE DEPARTMENT...." *Id.* at 711-12. The Public Safety Disability Retirement Board applied the 1991 standard to Officer Davis's case and denied disability benefits. After the Circuit Court for Anne Arundel County denied mandamus relief, Officer Davis appealed to the Court of Special Appeals.

The intermediate appellate court explained that, if it were necessary to determine the validity of the change in standards, that inquiry would turn on "whether the 1991 change diminished the disability benefits under the prior law without conferring other comparable benefits to the class." *Id.* at 717-18. However, it was not necessary to conduct that analysis, because the new standard applied "only prospectively as to disability rights that have not theretofore arisen," *id.* at 718, and Officer Davis's "contractual rights to disability benefits vested" under the pre-1991 pension contract because he was injured while the earlier

45

standard was still in effect. Therefore, the court remanded Officer Davis's case for reconsideration under the pre-modification standard. *Id.* at 721.

The cases we have summarized elucidate what up to now have been Maryland's key principles concerning public pension plan contract law, and which consistently have been applied in federal courts tasked with deciding Contract Clause impairment claims involving Maryland public pension plans. *See, e.g.*, *Maryland State Teachers Ass'n, Inc. v. Hughes*, 594 F. Supp. 1353 (D. Md. 1984) (applying *Quinn*); *Baker*, 487 F. Supp. at 467-70 (examining and applying *Saxton* and *Quinn*); *Cherry*, 2011 WL 11027560, at *6 (citing *Quinn* and *Davis*). We now consider the application of these precedents to the contentions of the parties in this case.

2. The City Breached Its Contract with the Retired and Retirement-Eligible Sub-Classes.

The City contends that the circuit court erred in ruling that it breached its contract with the Retired and Retirement-Eligible Sub-classes. According to the City, a correct reading of *Saxton* and *Quinn*, as well as federal Contract Clause cases, demonstrate that the City was allowed to make reasonable and necessary retrospective changes to the Plan. Alternatively, the City argues that Ordinance 10-306 only made prospective changes as to the Retired and Retirement-Eligible Sub-classes.

Appellants respond that the circuit court's analysis regarding the Retired and Retirement-Eligible Sub-classes was correct. They argue that, while *Saxton* and *Quinn* allow for the possibility of prospective modifications to pension plans, those decisions make clear that retrospective divestment of earned benefits violates plan members'

46

contractual rights. According to Appellants, the Contract Clause jurisprudence upon which the City relies does not call into question the validity of the distinction between retrospective and prospective pension modifications. Appellants further contend that the switch from the Variable Benefit to the tiered COLA was retrospective, not prospective, as to the Retired and Retirement-Eligible Sub-classes.

We agree with Appellants that the circuit court correctly determined that the City breached its contract with the Retired and Retirement-Eligible Sub-classes. The City's argument to the contrary based on *Saxton* and *Quinn* misses the mark. The City focuses on the language in *Saxton* stating that municipal corporations "may make reasonable modifications to pension plans," but the City does not grapple with the fact that, in the next breath, the *Saxton* Court qualified that statement by adding that such modifications may be made "at any time before the happening of the defined contingencies." 266 Md. at 694. *Saxton* thus suggests that a modification may not be made with respect to rights that become vested as a result of "the defined contingency" having occurred; rather, a modification may only be made prospectively, *i.e.*, in relation to benefits that have not yet vested.

With respect to *Quinn*, the City focuses on the Court of Special Appeals' statement that "[a]s government grows in size and complexity and as more employees draw from the fund, changes must often be made to assure the soundness of the fund and permit its growth commensurate with its prospective needs. The contractual or *vested rights* of the employee in Maryland are subject to a reserved legislative power to make reasonable modifications

47

in the plan, or indeed to modify benefits if there is a simultaneous offsetting new benefit or liberalized qualifying condition." *Quinn*, 35 Md. App. at 630-31 (emphasis added).

But this language must be read in the context of the opinion as a whole. As discussed above, *Quinn* made *Saxton*'s implicit retrospective/prospective distinction explicit. *See Quinn*, 35 Md. App. at 631 ("If reasonable substitution is offered by an employer and it is declined by the employee, he is barred prospectively from further claims upon the rejected plan…. But the rights which have accrued under the terminated plan may not be retrospectively withdrawn from him."). Moreover, the reference to "vested rights" italicized above comes in a paragraph that explicitly addresses prospective modifications and concludes by stating that, after a modification, "the employee must have available substantially the program he bargained for and any diminution thereof must be balanced by other benefits or justified by countervailing equities for the public's welfare." *Id.* at 630-31. Further, the *Quinn* Court cited as support for this holding a California case, *City of Downey v. Bd. of Admin., Pub. Emps. Ret. Sys.*, 121 Cal. Rptr. 295 (Cal. Ct. App. 1975). The *Downey* Court explained that, upon becoming a plan member, an employee has a contractual or vested right to a pension, "but that right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves. The statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system. The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension. There is no inconsistency therefore in holding that he has a vested right to a pension but the amount, terms and conditions of the benefits may be altered." *Id.* at 303.

Viewed in the context we have described, *Quinn*'s reference to "contractual or vested rights of the employee in Maryland [being] subject to a reserved legislative power to make reasonable modifications in the plan" does not refer to vested rights to specific benefits. Rather, it is properly understood to refer to the right, at the time employment begins, to have upon retirement either the pension plan that was in place when employment began or a "reasonable substitution" for that plan. *Quinn*, 35 Md. App. at 631.

In a final effort to find support for its position in *Quinn*, the City asserts that the *Quinn* Court ordered a remand for the lower court to consider whether the retroactive divesting of the police officers' prorated pension benefits through the substitution of plans was either reasonable or necessary. The City's interpretation of the remand in *Quinn* is incorrect. The circuit court in this case cogently explained why a remand was necessary in *Quinn*, notwithstanding the *Quinn* Court's holding that a retroactive divestment of pension rights is contrary to Maryland law:

> [T]he five *Quinn* plaintiffs were employed by the City of Frederick "at various times dating from September 12, 1942 until the present [April 13, 1977] or the recent past." *Quinn*, 35 Md. App. at 628. The original pension plan was effective "[a]fter 1951" and was "repealed on May 18, 1961 by resolution of the Board of Alderman of the City of Frederick. Thereafter, the officers on the police force were offered" a substitute plan. *Id.*
>
> These facts establish that the original plan at issue in *Quinn* was substituted smack in the middle of the span of years during which the five individual plaintiffs were employed by the City of Frederick, as they were employed "at various times" from 1942 until 1977 (or "the recent past"). Thus, for those *Quinn* plaintiffs who continued in active service following the adoption of the 1961 substitute plan, the substituted plan represented prospective change (as well as some measure of retrospective change given the *pro rata* system). With respect to the claims of these plaintiffs, therefore, the trial court was directed to make factual findings as to the necessity or

49

reasonableness of the substituted plan as a prospective change from its inception.

We agree with the circuit court concerning the meaning of the remand in *Quinn*.

The City's argument concerning Contract Clause jurisprudence fares no better. The Contract Clause provides: "No State shall … pass any … [l]aw impairing the [o]bligation of [c]ontracts[.]" U.S. Const. art I, § 10, cl. 1. "A very important prerequisite to the applicability of the Contract Clause at all to an asserted impairment of a contract by state legislative action is that the challenged law operate with retrospective, not prospective effect." *Hughes*, 594 F. Supp. at 1360. To determine whether such a retroactive enactment is an unconstitutional impairment of a contract, a court considers: "(1) whether there has been an impairment of a contract; (2) whether the state law has operated as a '*substantial impairment of a contractual relationship*'; and (3) if there has been a substantial impairment, whether the impairment is permissible because it is 'reasonable and necessary to serve an important public purpose.'" *Cherry*, 762 F.3d at 371 (quoting *Balt. Teachers Union v. Mayor & City Council of Balt.*, 6 F.3d 1012, 1015, 1018 (4th Cir. 1993)).

The City contends that the federal caselaw applying a "reasonable and necessary" test to determine the constitutionality of a state law that retroactively affects contractual rights militates in favor of our interpreting Maryland common law similarly. Under this theory, the circuit court was wrong to consider whether Ordinance 10-306 was reasonable and necessary only with respect to the prospective changes affecting the Active Sub-class, but rather also should have undertaken that same analysis as to the Ordinance's retroactive effects on the Retired and Retirement-Eligible Sub-classes.

50

Although the City does not explicitly ask us to abrogate *Quinn* and import federal Contract Clause analysis in place of *Quinn*'s retrospective/prospective distinction, that is the import of the City's argument. We decline the City's implicit invitation. As the Fourth Circuit explained in the federal appellate incarnation of this case,

> [a] state or municipality does not "impair the obligation of contracts" merely by breaching one of its contracts or by otherwise modifying a contractual obligation. As we stated in *Crosby v. City of Gastonia*, "[i]t would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution." 635 F.3d 634, 642 n.7 (4th Cir. 2011) (quoting *Horwitz–Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996)). Thus, our task is not to decide whether a breach of contract has occurred, but to determine whether the City has erected a legal barrier "that [has] prevented the [plaintiffs] from obtaining damages, or some equivalent remedy, for [any] breach." *Horwitz–Matthews*, 78 F.3d at 1251.

*Cherry*, 762 F.3d at 371. In short, a breach of contract claim is not equivalent to a Contract Clause claim. While all constitutional impairments of contracts are breaches of contract under Maryland law, not all breaches of contract rise to the level of an unconstitutional impairment.

Finally, the City contends that Ordinance 10-306's substitution of the tiered COLA for the Variable Benefit was a prospective change as to the Retired and Retirement-Eligible Sub-classes. As the City observes, future variable benefits "were entirely contingent on market performance." Thus, according to the City, the Retired and Retirement-Eligible Plan members did not have vested rights to any future Variable Benefits: "In this Court's words in *Saxton*, the 'defined contingencies' – the declaration and calculation of a variable benefit in the future – had not yet happened."

51

We disagree with the City's characterization of "the declaration and calculation" of a future Variable Benefit as a "defined contingency" that had to occur before the Retired and Retirement-Eligible Sub-classes would have a vested right with respect to receipt of such a Variable Benefit. What *Saxton* had in mind as a defined contingency was an act of the employee that triggered the requirement of the government-employer to provide the promised benefit(s). In *Saxton*, it was the death of a member in service from injuries sustained in the line of duty that entitled a surviving spouse to receive a special death benefit. In *Quinn*, it was the retirement of a police officer "in good standing" who had served on the force for a period of 20 consecutive years (or for a shorter period of time, in which case the officer would receive prorated benefits). In this case, a Plan member's attainment of Service Retirement eligibility (reaching 50 years of age or accruing 20 years of service (with somewhat different rules for membership beginning on or after July 1, 2003)) triggered their entitlement to any future Variable Benefits that were required to be paid based on investment performance.

To conclude our analysis of this argument and the City's claim of error in its entirety, we again turn to the circuit court's ruling:

> The City argues that "Ordinance 10-306 did not retroactively withdraw any [Variable Benefit] raises" paid since the Variable Benefit was adopted in 1983. "Rather, it adopted a different mechanism for providing future raises." Therefore, "no 'rights which have accrued under the terminated plan' – *i.e.*, the variable benefit – were 'retrospectively withdrawn' from the retirees." …. In the opinion of this court, the City has the wrong end of the stick.
>
> In addressing the pro rata pension benefits at issue there, the *Quinn* court determined that "future benefits vested as they were prorately earned." *Quinn*, 35 Md. App. at 630. The proportionate prorating provision of the old plan "act[ed] as an express assurance to the employees that pension benefits

they have earned by satisfactory service cannot be divested." *Id.* Likewise, for Plan members who have satisfied all terms of service to earn, or to be entitled to earn, the Variable Benefit, prior to the effective date of Ordinance 10-306, their rights in same vested absolutely. The notion that by virtue of the Variable Benefit's market driven nature, Retired and Retirement-Eligible Sub-Class members, despite having satisfied all terms of service and defined contingencies, nevertheless float from one year to the next in some undefined, ethereal place, with the barest tether to entitlement – neither vested and yet not quite non-vested – is unpersuasive. Likewise, to reduce earned or accrued pension benefits to cash in hand or bust defies logic and flies in the face of controlling law.

In sum, inasmuch as Retired Sub-Class members were entitled to, and receiving, Plan benefits as of the effective date of the Ordinance …, the court is not persuaded by the City's argument that the Ordinance does not retroactively impair or diminish the rights or benefits of these Class members under the Plan. Further, as Retirement-Eligible Sub-Class members were eligible to retire as of the effective date of the Ordinance, but not entitled to receive Plan benefits solely because they remained working …, the court is not persuaded by the City's argument that the Ordinance does not retroactively impair or diminish the rights or benefits of these Class members under the Plan. Instead, … the court finds that the City, by way of the Ordinance, breached its contract with Retired Sub-Class and Retirement-Eligible Sub-Class members by unlawfully withdrawing or removing previously earned and accrued benefit entitlements, specifically the Variable Benefit.

We cannot say it any better. We affirm the circuit court's determination that the City breached its contract with the Retired and Retirement-Eligible Sub-classes.

3. The City Did Not Breach Its Contract with the Active Sub-Class.

Appellants argue that the circuit court incorrectly determined that the City did not breach its contract with the Active Sub-class. Primarily, Appellants contend that the court erred in holding that the City had a reserved power to modify the contract to serve the public interest, notwithstanding the language in § 42 promising not to diminish or impair pension benefits. Thus, according to Appellants, the circuit court should not have

undertaken a "reasonable or necessary" analysis with respect to Ordinance 10-306's effect on the Active Sub-class. To the extent such an analysis was appropriate, Appellants argue that the circuit court erred in concluding that Ordinance 10-306 gave the Active members substantially the program they had bargained for.

The City responds that it was entitled to modify the Plan because, unlike the Retired and Retirement-Eligible members, the Active members had not yet satisfied the "defined contingencies" before the enactment of Ordinance 10-306. According to the City, the changes to the Plan as to the Active members were all prospective, and § 42 does not eviscerate the City's reserved power to make such reasonable and necessary prospective changes to the Plan. A contrary interpretation, the City argues, would render Article 22 void *ab initio*, as the City cannot bargain away its legislative powers. Finally, the City asserts that the circuit court thoroughly compared the old Plan to the Plan as it existed after enactment of Ordinance 10-306 and correctly concluded that the Active members received substantially the same program under the new Plan, but to the extent there was a diminution, it was more than justified by countervailing equities involving the welfare of the City.

We agree with the City that there was no breach of contract as to the Active Sub-class. The City has the reserved legislative authority to make unilateral prospective modifications to the Plan, provided that the substitutions are reasonable and necessary. Section 42 does not and cannot bargain away this reserved power. Thus, the circuit court properly considered whether the prospective changes to the Plan were reasonable and necessary. We agree with the circuit court's findings and conclusions regarding the

reasonableness and necessity of the changes to the Plan that the City Council made when it enacted Ordinance 10-306.

>    a. *The City Has the Reserved Legislative Power to Make Reasonable and Necessary Prospective Modifications to the Plan That Cannot Be Bargained Away.*

As discussed above, *Saxton* and *Quinn* demonstrate that, while a governmental employer may not retrospectively divest an employee of earned pension benefits, it has the reserved legislative authority to make reasonable and necessary prospective modifications to a Plan before the happening of the Plan's "defined contingencies." *See Saxton*, 266 Md. at 694; *Quinn*, 35 Md. App. at 630-31. This reserved legislative power exists whether or not the operative statute expressly references it. *See City of El Paso v. Simmons*, 379 U.S. 497, 508 (1965) ("Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."); *Baker*, 487 F. Supp. at 468 ("The power of the legislature under applicable state law to modify its own pension contracts is part of each pension plan which a legislature enacts, whether explicitly included or not."); *see also Hughes*, 594 F. Supp. at 1362 (where a contract concerns "the level of compensation to be paid State employees … for their services to the State," it is "not one

as to which one legislature can bind subsequent legislatures for work and services to be performed by State employees … *in the future*") (emphasis in original).[20]

Appellants contend that § 42 of Article 22 changes the calculus. That provision states: "Upon becoming a [member of the Plan], … such member shall thereupon be deemed to have entered into a contract with the Mayor and City Council of Baltimore, the terms of which shall be the provisions of this Article 22, as they exist at the effective date of this ordinance, or at the time of becoming a member, whichever is later, *and the benefits provided thereunder shall not thereafter be in any way diminished or impaired*." (Emphasis added). Appellants effectively assert that, with respect to each member of the Plan, § 42 provides immediate vesting of the benefits that exist in the Plan at the time the member enrolls by promising not to make prospective changes.

---

[20] At least two Maryland counties expressly reserve legislative power to modify their pension plans. *See* Baltimore Cty. Code, § 5-1-259 ("The county shall from time to time amend this subtitle in such manner as may be found to be advisable to meet changed conditions or, as in the light of experience, may be considered necessary."); Anne Arundel Cty. Code of Ord., § 5-1-103(a) ("It is intended that each plan be permanent, but the County reserves the right to amend or terminate each plan."). However, as stated above, the absence of such an express reservation of legislative power does not mean the power ceases to exist.

Another notable provision that is found in these other two plans that is missing from the City's Plan are "vesting" clauses. In Baltimore County, an employee's benefits vest after successful completion of 10 years of service. Baltimore Cty. Code, § 5-1-101(8)(ii). This is a *pro rata* vesting clause similar to the clause at issue in *Quinn*. In Anne Arundel County, the members accrue rights to the plan's benefits and the County expressly provides that any amendment or termination "may not adversely affect accrued benefits as of the effective date of the amendment or termination." *See id.* §§ 5-1-103(a), 5-1-101(36). If the Plan in this case had specifically provided that members accrue *benefits* on a pro rata basis, this case would resemble *Quinn*. That is, any change to an Active member's benefits in such an instance would be partially retrospective and partially prospective.

We do not read § 42 as Appellants do. Section 42 explicitly states that a contractual relationship exists between the City and each plan member. It does not speak specifically to any particular benefit set forth in the Plan. The general statement in § 42 that the "benefits provided" under the Plan "shall not thereafter be in any way diminished or impaired," in our view, essentially mirrors the rule that *Saxton/Quinn* states: once benefits have been *provided* to a member (*i.e.*, once they have vested as a result of the employee having earned them per the terms of service), the City cannot thereafter retrospectively diminish or impair them.

Thus, contrary to Appellants' contention, § 42 is not analogous to the pro rata accrual provision at issue in *Quinn*. That pro rata provision created vested rights as the employees worked as police officers over the course of their careers. Each year, a greater percentage of their pension became vested, and any future change to the pension plan by the City of Frederick could not divest the officers of the accrued portion. Here, in contrast, the benefits set forth in the Plan do not vest until the members reach Service Retirement eligibility. Once they meet that condition precedent, as we have held above, the City may not retrospectively diminish or impair them. However, until the members reach Service Retirement eligibility, the City may make modifications to the Plan, provided they are reasonable and necessary.

Accepting Appellants' interpretation of § 42 would result in a contract that is void as against public policy. We generally are hesitant to invalidate voluntary bargains on public policy grounds, and thus we do so "only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the

57

entire community would ... pronounce it' invalid." *Maryland–Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 606 (1978) (quoting *Estate of Woods, Weeks & Co.*, 52 Md. 520, 536 (1879)). However, if we were to interpret § 42 as Appellants suggest, we indeed would be confronted with a contract that is patently offensive to the public good.

As noted above, where a statutory contract concerns the level of compensation to be paid to public employees for their services to the governmental body, the enacting legislature cannot bind subsequent legislatures for work and services to be performed by the employees in the future. *Hughes*, 594 F. Supp. at 1362. Treating such a contract as "irrevocable" would render it void *ab initio* since it would have "surrender[ed] an essential attribute" of the government's sovereignty – *i.e.*, the police power, which the "legislature cannot bargain away." *Id.* at 1360 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977)); *see also Montgomery Cty. v. Bigelow*, 196 Md. 413, 423 (1950) ("The legislature cannot by statute 'preclude' the repeal of any statute by a subsequent legislature."). Appellants construe § 42 as rendering the terms of the Plan irrevocable as to current members whose benefits have not vested. That construction would render the Plan void *ab initio* for violating the reserved powers doctrine. *See State v. Good Samaritan Hosp. of Md., Inc.*, 299 Md. 310, 319 (1984) ("It is well settled that the Contract Clause must be accommodated to the inherent police power of a sovereign state to protect the general welfare of its people."). The public policy implicated by Appellants' argument is the need for local governments to retain the ability to legislate for the public good – an essential element of their sovereignty. In sum, our interpretation of § 42 is reinforced by

58

the recognition that Appellants' contrary interpretation would render the Plan void. *Cf. City of San Antonio v. San Antonio Firefighters' Ass'n*, 533 S.W.3d 527, 532, 543-46 (Tex. Ct. App. 2017) (a contract that bargains away a city's reserved legislative power is void as against public policy, but San Antonio's collective bargaining agreement with the firefighter's union, which expired after a maximum of 15 years, did not violate public policy by failing to be terminable at the will of the city).

*Harford County v. Town of Bel Air*, 348 Md. 363 (1998), relied upon by Appellants, is not to the contrary. Appellants cite *Harford County* for the proposition "that municipal contracts are not subject to modification based on the public interest." In *Harford County*, we rejected the County's governmental immunity defense to the Town of Bel Air's claim. The County asserted, as its primary argument, that it was "entitled to abrogate its obligations under a contract entered into in performance of a governmental function if dictated by the public good." 348 Md. at 370 (internal quotation marks omitted). We restated this Court's consistent position that "counties and municipalities have never been granted immunity in contract actions." *Id.* at 373. We distinguished two cases involving the constitutionality of legislative actions that repealed statutes, noting that

> [t]he holdings in both cases were that the subsequent repealing statutes did not violate the Contract Clause because the earlier statutes did not grant or authorize such vested contract rights that would be protected by the Contract Clause. The references to governmental purposes and "public good" in both opinions were integral parts of the holding that the subsequent repealing statutes were valid under the Contract Clause. Such references did not

constitute any recognition of local governmental immunity from suit in contract actions.

*Id.* at 380. Therefore, we held that the County "has no governmental immunity in contract actions or in declaratory judgment actions relating to contractual rights and liabilities," *id.* at 373, even if the County abrogated its contractual obligations for "public good." *Id.* at 370.

*Harford County* does not mention the reserved powers doctrine, let alone abrogate *Saxton* and *Quinn*. We agree with the City that "the type of contracts at issue (waste disposal) or discussed (construction) in *Harford County* are fundamentally different from pension plans that purport to tie a municipality's hands for decades to come … and which threaten its ability to provide core services to its citizens. Given their 'multifaceted' nature, as they are based on 'actuarial assumptions which may or may not turn out to be accurate,' pensions are simply different from other government contracts."

Having correctly determined that the City had the authority, notwithstanding § 42, to make reasonable prospective modifications to the Plan, the circuit court undertook an analysis of the reasonableness and necessity of those modifications. We now turn to that analysis.

*b. The Circuit Court Correctly Concluded That Ordinance 10-306 Was Reasonable and Necessary.*

After conducting a lengthy trial, the circuit court found that Ordinance 10-306's changes were reasonable and necessary and concluded that the City did not breach its contract with the Active members. We agree with the circuit court's ruling.

Tracking the points the *Quinn* Court opined were relevant in assessing the validity of a prospective change to a pension plan, the circuit court made numerous findings of fact in its Memorandum Opinion. Pertinent to the issue at hand, the court found:

1. At the time Ordinance 10-306 was passed, the City's "dire financial and related circumstances extended to all City residents."

2. "At the time the City adopted Ordinance 10-306, the Variable Benefit was unsustainable as a method of providing post-retirement benefit increases."

3. "[C]ontinuation of the Plan unchanged would, in relatively short order, cannibalize the Plan's basic benefit."

4. Action to improve the actuarial soundness of the Plan was necessary at the time Ordinance 10-306 was enacted; "[t]he objectively verifiable and undisputed facts are that the City was in financial free fall; and – critically – even had the City not been in financial crisis, the Plan judged on its own merit was actuarially unsound and plainly unsustainable…. This was not theory subject to debate. This was reality. The Plan was unsound, unsustainable, and the City simply had to do something to turn it around."

5. "[W]hen it appeared inevitable that legislative changes would be made, the [police and firefighter] unions acknowledged that the City could not afford to repair the funding level of the Plan by reducing the post-retirement assumed rate of return to five percent. The unions proposed scrapping the Variable Benefit entirely in favor of a plan that included a fixed COLA and increasing employee contribution requirements by three percent (to nine percent) spread over an equal number of years."

6. The testimony of the City's expert witnesses was "credible, persuasive, and helpful, occasionally to the point of enlightening" concerning the "trajectory of the Plan (including the state of Plan assets) had it not been modified by law." The testimony of the Appellants' expert witnesses was not "comparatively credible or persuasive."

7. "[T]he City was unable to absorb the nearly $62 million cost to the General and Motor Vehicle Fund budgets that would have resulted had the City modified the post-retirement assets earning investment rate from 6.8 to five percent as recommended[.]" And "additional tax revenue was effectively unavailable to resolve the problem, given the already tapped tax base of the City."

8. PFM, the City's outside consultant, "advised the City in 2010 that 10-306 as proposed (and later adopted) would enhance the Plan's integrity and improve its [actuarial] soundness by enabling unfunded liabilities to be paid down."

9. Ordinance 10-306 was reasonably intended to preserve the integrity of the Plan by enhancing its actuarial soundness.

10. The new 0-1-2 COLA, which replaced the Variable Benefit, "was properly intended to provide increases in income at stages of life when the City determined members were most likely not to have secondary employment or alternative sources of income[.]"

11. Under the revised Plan, the City became a guarantor of the 0-1-2 COLA and all past Variable Benefit payments; the City previously did not guarantee Variable Benefit payments.

12. "[U]nder the revised Plan, for the first time, the Plan provides a minimum annual benefit for qualifying spousal beneficiaries[.]"

13. The new Plan "grandfathers certain Plan members into pre-Ordinance Service Retirement eligibility criteria" and "includes a new early retirement benefit enabling non-grandfathered Plan members to retire at pre-10-306 Service Retirement eligibility dates[.]"

14. "[U]pdated levels of employee contribution increases are phased in over several years[.]"

15. "[T]he revised Plan grandfathers into pre-10-306 DROP 2 eligibility those with qualifying years of service[.]"

16. "[T]he revised Plan grandfathers into pre-10-306 AFC calculation those with qualifying years of service."

17. Several "countervailing public equities" existed at the time the City Council modified the Plan, including:

(a) The existence of "woefully anemic core services" following "shocking reduction in life-saving public essentials like fire-fighting and police units to important basic public health and welfare-related waste disposal services"; "these core service cuts, necessitated in large part by the nation's financial circumstances that had overcome the City, placed the City's residents in peril."

(b) "[E]nsuring the City has the capacity to continue to pay the basic Plan benefit is, itself, an important public equity…. The Plan, if left unmodified, was on track to run out of assets – not in theory, but with near certitude; not in some far off future, but in the relative near term."

18. The City's expert witnesses were also "credible and persuasive on the subject of the impact of the comparative differences of the pre- and post-10-306 Plan on the Class (and Sub-Classes)." Appellants' experts' opinions "were neither credible nor persuasive on the question of whether the post-10-306 Plan provides Active Sub-Class members substantially the Plan they bargained for at the start of employment."

19. Plan members who met pre-10-306 Service Retirement eligibility as of June 30, 2010, as well as members with 15 or more years of covered service as of June 30, 2010, are grandfathered into pre-10-306 Service Retirement eligibility criteria.

20. "[T]he increase in the minimum service requirement from 20 to 25 years for non-grandfathered employees will most likely impact a minority of employees in their retiring planning horizon, by one to at most five years; and, for these employees, the resulting pension at retirement with 25 years of service would be larger than they would have received retiring with 20 to 24 years of service under pre-10-306 provisions."

21. Regarding the impact of the AFC calculation, "employees retiring with 25 or more years of service who did not receive a pay increase in the final two years of employment would have received the same retirement benefit under the pre-10-306 Plan as they will receive under the revised Plan. For those affected by the change in AFC calculation, the paid benefit remains substantially the same."

22. The new COLA provides "predictability and reliability" and, therefore, "stability in a way the Variable Benefit cannot given its market dependency."

23. "[A]s far as hard dollars are concerned, the COLA measures up well to the Variable Benefit." As the City's expert explained (and the circuit court credited), "[t]he age-based COLAs are expected to deliver larger increases over an employee's lifetime than under the variable benefit provisions prior to Ordinance 10-306. Accordingly, the lifetime income under 10-306 is expected to be reasonably equivalent (and certainly more predictable) than the benefits that would have been payable had Ordinance 10-306 not been adopted."

24. The "actual effect the [tiered] COLA has had on retiree benefits (versus the Variable Benefit) since the Ordinance passed[] … further solidifies the court's conclusion that the post-10-306 Plan provides Active Sub-Class members the substantial benefit of their bargain."

25. Ordinance 10-306 "made reasonable prospective modifications to the Plan's terms, including Plan benefits affected by the Ordinance…. [T]he prospective modifications to Plan benefits were balanced by a combination of essential and overwhelming public welfare considerations, and new benefits or qualifying conditions. The Ordinance was 'a reasonable change promoting a paramount interest of the State without serious detriment to the employee.' *Quinn*, 35 Md. App. at 631."

Based on our review of the record, we perceive no clear error in the circuit court's factual findings or any legal errors in the court's analysis. We cannot say that the circuit court erred in accepting the opinions of the City's experts and rejecting the opinions of Appellants' experts concerning the state of the City's finances at the time of the Ordinance's enactment and the comparison of pre- and post-10-306 Plans. We also find it significant that, during the negotiations prior to 10-306's enactment, the unions expressed their agreement that the Plan was in trouble and that the Variable Benefit should be eliminated and replaced with a COLA that was not market-driven. The unions also suggested increasing employee contributions. While the parties ultimately could not agree on the specific changes that should be made to the Plan, spawning more than a decade of

66

litigation, there is no dispute that the Plan urgently needed to be changed to ensure its actuarial soundness.

In sum, we are satisfied that the circuit court correctly concluded that: (1) the Ordinance was reasonably intended to preserve the integrity of the Plan; (2) the changes to the Plan, as they affected the Active members, were reasonable changes promoting a paramount interest of the City without serious detriment to the employee; (3) post-10-306, the employees received substantially the Plan they bargained for; and (4) to the extent any benefits were lessened or other terms became more onerous, those changes were balanced by a combination of overwhelming public welfare considerations *and* new benefits or qualifying conditions.

We emphasize the "and" in the preceding sentence to highlight an important clarification to *Quinn*. In *Quinn*, the Court of Special Appeals stated that "the employee must have available substantially the program he bargained for and any diminution thereof must be balanced by other benefits *or* justified by countervailing equities for the public's welfare." *Quinn*, 35 Md. App. at 631 (emphasis added). The disjunctive "or" in the *Quinn* Court's formulation means that a governmental body's dire financial situation, by itself, could balance a prospective "diminution" of Plan benefits. We believe fairness dictates that such a diminution be balanced both by other benefits *and* countervailing equities for the public's welfare. As we have explained, the City does have the power to change the benefits under the Plan as to active employees. However, we recognize that, for some Active members, Ordinance 10-306 moved the goalposts very shortly before they were about to cross the goal line and achieve Service Retirement eligibility. Many of those employees

67

undoubtedly had given the best years of their careers to Baltimore City, serving the public daily in dangerous and stressful jobs. Although a governmental employer always retains its reserved power to make prospective changes to a public pension plan, it may make such changes only if any resulting diminutions in benefits are balanced by countervailing public equities *and* the addition of other benefits/terms, which provide the employees with substantially what they bargained for. Put another way and more simply, a prospective change to a pension plan must be both reasonable *and* necessary.[21]

In this case, the circuit court correctly found that, with respect to Active members, the changes to the Plan were balanced by "a combination of essential and overwhelming public welfare considerations, and new benefits or qualifying conditions." In other words, Ordinance 10-306's changes were reasonable and necessary. Accordingly, we affirm the circuit court's determination that the City did not breach its contract with the Active Sub-class.

### C. The Circuit Court Did Not Err in Calculating the Damages Awarded to the Retired and Retirement-Eligible Sub-Classes.

As discussed above, by enacting Ordinance 10-306, the City breached its contract with the Retired and Retirement-Eligible Sub-classes. As a remedy for the breach, the

---

[21] This conjunctive formulation is consistent with Contract Clause jurisprudence, under which a court considers whether a substantial impairment to a contract is permissible because it is "reasonable and necessary to serve an important public purpose." *Cherry*, 762 F.3d at 371 (internal quotation marks and citation omitted). Although we have explained above that a Maryland breach of contract claim is not coextensive with a Contract Clause claim, the federal constitutional standard ("reasonable and necessary") is appropriate to apply when considering whether a prospective change to a Maryland public pension plan is permissible or whether it breaches a statutory contract with plan members.

circuit court declined to order specific performance – *i.e.*, reinstitution of the Variable Benefit for the Retired and Retirement-Eligible Sub-classes[22] – but rather calculated the monetary damages the City owes to the Retired and Retirement-Eligible Sub-classes as a result of 10-306's replacement of the Variable Benefit with the tiered COLA.

Appellants contend that the circuit court erred in calculating the damages the City owes to these two Sub-classes by relying on incorrect assumptions made by the City's expert witness, Adam Reese, and rejecting the testimony of Appellants' experts, Thomas Lowman and Colin England. Perceiving no clear error in the circuit court's factual findings, we affirm the court's calculation of damages.

As stated above, we review the factual findings of the circuit court for clear error and must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence. *See City of Bowie*, 398 Md. at 676; *Urban Site Venture II Ltd. P'ship*, 340 Md. at 229-30.

The circuit court did not find Appellants' expert witnesses, Messrs. Lowman and England, to be "credible or persuasive on the issue of what assumptions, bases and projections should be applied to calculate damages of the Retired and Retirement-Eligible Sub-Class members." The court offered multiple reasons for this finding. "One of the primary reasons" was Appellants' experts' "reliance on a five percent post retirement assets earnings assumption rate as the basis for a significant portion of their determination of what

_____

[22] Appellants have not appealed this part of the circuit court's ruling.

69

the prevailing Class members would have received had the Variable Benefit remained in place," despite the fact that the City Council never voted to reduce the rate from 6.8% to 5% prior to the enactment of Ordinance 10-306, which had "the effect of materially inflating damages without basis in fact."

In addition, as the circuit court explained, as to the over $400 million in losses due to the technology bubble burst, Appellants' experts assumed "that the City recognized those losses between 2002 and enactment of the Ordinance, resulting in hundreds of millions of dollars in City Plan contributions. This did not happen and, even were the court to allow that double smoothing was chicanery, the notion that the City had even a fraction of that capacity is rather a whopper of a departure from reality." The court concluded that "attributing those extra contributions to the retirees' reserves (the PRF and the ARF) until they are fully funded, which wildly skews the amount of Variable Benefit in favor of Plaintiffs[,] does not reflect how Plan assets were actually accounted for among the pre-10-306 Plan funds; nor is it required by the Plan language."

Moreover, the circuit court found, Appellants' experts ignored "the well-documented, deliberate Board practice of not tethering the Variable Benefit conversion rate to the post-retirement investment rate given the reality of the bond market (*i.e.*, not yielding returns on par with the statutory 6.8% assumed investment rate) and the importance of avoiding volatile investments for retirees reserves" and instead used "a 6.8% conversion rate − which ha[d] the effect of enhancing Plaintiffs' damages without suitable explanation of the presumed hike in rate." The court also took issue with Appellants' experts' assumptions that employee contributions from workers hired on or after July 1, 2010, and

70

associated employer contributions for those new hires, would be included in calculating Variable Benefit increases, despite new hires not being entitled to the pre-Ordinance 10-306 Plan terms and benefits. Lastly, the court determined the basis for Appellants' volatility forecast and projections for future investment returns to be "outdated, outmoded, and unrealistically reliant on rarefied air of investment returns in ranges well above 40% in some years."

The court summarized Appellants' experts' damages analysis as building upon Appellants' "breach by underfunding argument to calculate damages on a multi-faceted foundation of hundreds of millions of dollars in phantom City contributions (and capacity), an overly robust 6.8% conversion rate, post-10-306 new employee and employer contributions, and by booking these contributions singularly for the benefit of retirees until those funds are slated to be fully funded" and having return on investment projections that were "not well-based." Therefore, the court concluded:

> In sum, in the opinion of the court, Plaintiffs' damages theory is unsupported by historic fact and is unaccompanied by persuasive explanation why the court should go along with these assumptions. Plaintiffs' theory is also unavailing as a matter of law, as it purports to place the prevailing Class members in a considerably better position than had the Plan not been modified. Contract law does not countenance a windfall for aggrieved parties, but rather mandates their position be righted.

In contrast, the circuit court found the City's expert, Mr. Reese, to be "credible, persuasive, and helpful to the court on the issue of the appropriate assumptions, bases and projections to utilize in determining what damages, if any, the Retired and Retirement-Eligible Sub-Class members are entitled, both pre- and post-final judgment." According to the court, the City's damages analysis "is based on terms of the pre-10-306 Plan and the

71

City's documented, known, and Board-approved practices in place just prior to Plan modification" and its calculations "provide outcomes based on assets actually in the Plan when the modification was enacted and on a closed pre-10-306 Plan." Therefore, the court concluded that "[t]he City's proposed damages bases and assumptions ensure, to the degree possible, the members of the Retired and Retirement-Eligible Sub-Classes will receive the Variable Benefits they would have received had the Plan not been modified."

Having considered the testimony of the experts from both parties, the circuit court determined that calculations of damages would follow the City's model:

> The court will, therefore, apply the City's proposed assumptions, projections and overall method of calculating Variable Benefits the members of the Retired and Retirement-Eligible Sub-Classes would have received from the effective date of Ordinance 10-306 to the date of final judgment (including known FY 2010 through FY 2017 investment performance), and thereafter, reduced to present value. The pre-10-306 Plan will be treated as closed to new employees and new retirees following June 30, 2010, and calculated damages will implement Mr. Reese's Variable Benefit averages based on his 20 trials and shall be based on the amortization period and method in place in June 2010.

Appellants argue that, by relying on Mr. Reese, the circuit court erred in its determination of how to calculate "Variable Benefit" increases if Ordinance 10-306 had not been passed, which dramatically reduced the damages award in this case. According to Appellants, the court erred by accepting Reese's hypothetical two-plan model (Closed Plan and New Plan) to measure damages. Appellants also assert that the court erred by assuming that the Board of Trustees would not have acted to ensure that the retiree reserves in the PRF were fully funded.

72

In addition, Appellants challenge the court's assessment of their experts' analysis as neither credible nor persuasive. Appellants contend it was reasonable for Appellants' experts to assume that the City would have adopted the 5% post-retirement earnings assumption rate "based upon the Mayor's testimony that the City would have had no choice but to adopt this rate and make an increased contribution to the Plan in the absence of a reduction of benefits." Moreover, according to Appellants, it was reasonable for their experts to assume that the Board of Trustees would exercise its statutory authority and perform its fiduciary duty to adequately fund the retiree reserves. Finally, Appellants assert that their volatility forecast and projections were reasonable and consistent due to applying a weighted average to the 10,000 outcomes produced in the forecast.

The City counters that Mr. Reese's model was an accurate damages model based on a hypothetical "but for world" that assumed no breach and separated the Sub-classes into two categories – those in the "Closed Plan" (Retired and Retirement-Eligible Sub-class members) and those in the "New Plan" (Active Sub-class members and members who joined the Plan on or after July 1, 2010). According to the City, Mr. Reese's model was based on Article 22 and actual past practice, which "showed conclusively that most retirees have fared and are expected to fare better under Ordinance 10-306's guaranteed COLAs than under the previous variable benefit."

Appellants contend that the dispute over the analysis by the respective experts rests on questions of contract interpretation, and that we therefore should review without deference the circuit court's "credibility" determinations as to the competing experts.

Assuming without deciding that *de novo* review applies to the circuit court's choice of assumptions to apply in the damages calculation, the result is no different.

As explained above, the pension benefits of the Retired and Retirement-Eligible Sub-classes fully vested prior to the enactment of Ordinance 10-306. Having vested, any change to the pension benefits cannot "be diminished or impaired" under § 42. In this sense, the Retired and Retirement Eligible Sub-Classes are "closed" from changes enacted by Ordinance 10-306. However, as the court found and we have affirmed, the City was permitted to apply the new COLA to the Active Sub-class (and, of course, to members who were hired after the enactment of the Ordinance). In this sense, the members of the Active Sub-class and new hires work in the "new" world of the COLA increase under Ordinance 10-306.

With this framework in mind, the circuit court's acceptance of Mr. Reese's two-Plan construct comes into better focus.[23] Appellants believe that the Retired and Retirement-Eligible Sub-classes' damages should be assessed under a hypothetical post-June 30, 2010 Plan in which there were no prospective changes made to the Plan as to the Active members and new hires. But the circuit court was correct not to measure damages in that way. The City had the power to make the prospective changes that it did. Moreover,

---

[23] While the circuit court criticized Appellants' experts' damages model as unpersuasive and not credible, the circuit court did find that Appellants' experts had "deep institutional knowledge of the Plan and changes made to the Plan over time," and that all trial experts for the parties collectively were "well-qualified to render their respective opinions, their testimony was appropriate on the subject matters about which they testified, and each expert's testimony had sufficient factual basis." Thus, the court considered the testimony of Appellants' experts, and rejected it.

as the circuit court found, if the City had not made those prospective changes, the Plan would have run out of funds to pay the basic benefit to Plan members in the near term. For these reasons, it was appropriate for the court to accept Mr. Reese's assumptions, which accounted for different Plans for the "closed" group and the "new" group. The court correctly rejected Appellants' experts' pie-in-the-sky one-group Plan; such a hypothetical Plan would have self-destructed, leaving the Retired and Retirement-Eligible members with no pension at all.

Similarly, the circuit court correctly declined to accept Appellants' experts' other assumptions, including extra contributions by the City to fully fund the PRF, and the recognition of the technology bubble losses more quickly than had actually occurred in the 2000s. These assumptions did not accord with Article 22's requirements and the historical administration of the Plan by the Board of Trustees and the City; had the circuit court accepted those assumptions, the Retired and Retirement-Eligible members improperly would have received a windfall. In contrast, Mr. Reese offered a reasonable damages calculation model based on the terms of the pre-10-306 Plan and the City's documented, Board-approved practices in place just prior to the Plan modification by Ordinance 10-306.

In sum, we conclude that Mr. Reese's damages model provided the circuit court with an accurate assessment of how the members of the Retired and Retirement-Eligible Sub-classes would have fared if, hypothetically, the City had retained the Variable Benefit for them but made the prospective changes to the Plan for other members that we have held the City was permitted to make. This is the proper measure of damages, given that the

actual Plan at all times includes some members whose rights to benefits have vested and others whose rights to benefits have not yet vested.

Mr. Reese's analysis, based on assumptions that we have found are correct, provides "competent material evidence" to support the circuit court's factual findings as to damages. Because there is competent material evidence to support the findings of the circuit court, no clear error exists here, and we therefore affirm the circuit court's damages calculation for the Retired and Retirement-Eligible Sub-classes.

## IV

## Conclusion

The record makes clear that the City took no pleasure in modifying the Plan with the enactment of Ordinance 10-306. The City was faced with a lose-lose proposition: either change the terms of the Plan and incur the wrath of its members, or allow the unsustainable Plan eventually to consume itself from within, harming the Plan members and all City residents. The City opted for the former approach. As to the Active Sub-class, Ordinance 10-306's changes made reasonable and necessary prospective changes. Thus, the City did not breach its contract with the Active Sub-class. However, the Ordinance retrospectively divested Retired and Retirement-Eligible members of the benefits they had earned by reaching Service Retirement eligibility. The City breached its contract with those Sub-classes and is liable for damages to the members as calculated and ordered by the circuit court.

For the reasons stated above, we affirm the judgment of the Circuit Court for Baltimore City.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**